THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND JOHNSON, Defendant-Appellant.

First District (2nd Division) No. 1—94—4276

Opinion filed December 3, 1996.

Rita A. Fry, Public Defender, of Chicago (Elyse Krug Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RAKOWSKI delivered the opinion of the court:

Following a bench trial, defendant was found guilty of first degree murder, home invasion, and residential burglary. He was sentenced to 80 years for murder and concurrent terms of 30 years and 10 years for home invasion and residential burglary, respectively. Defendant appeals his convictions and sentences, contending: (1) the trial court erred in denying his motion to suppress a statement made at the time of his arrest based on a violation of *Miranda*; (2) the trial court erred in denying his motion to suppress a confession based on its involuntariness; (3) the trial court erred in denying his motion to suppress a confession based on his inability to knowingly and intelligently waive his *Miranda* rights due to his substance abuse; (4) the trial court erred in admitting the victim's hearsay statement as an excited utterance; (5) the trial court erred in sentencing defendant on the home invasion and residential burglary convictions where these offenses are lesser included offenses of felony murder; (6) the trial court erred in sentencing defendant to an extended 80-year sentence; (7) the trial court erred in considering defendant's substance abuse as an aggravating factor in sentencing; and (8) the mittimus must be corrected to reflect the proper sentences imposed. Pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23), issues two and three are the only publishable issues. We affirm defendant's convictions and sentences.

## FACTS

Defendant was charged with the murder of Halina Grochowski, which occurred on September 5, 1992.

Defendant's court-reported statement indicated that Halina was his girlfriend and, until two months prior to her death, they had lived together. Following their breakup, they continued to see each other as she was tutoring him for his GED examination.

At 1 or 2 a.m. on September 5, 1992, defendant called Halina because he wanted money for drugs. He told her he had something important to tell her and had money for her. She agreed to meet in the lobby of her building. Defendant arrived at the building and the guard, who knew defendant, let him in. Defendant told the guard he was visiting another friend who lived in the building.

When defendant knocked on Halina's door, she refused to open it. After reminding defendant he was not allowed there, Halina told him to back away from the door and she went into the hallway. Halina attempted to close the door, defendant put his foot in, and said "Baby, let me in." Halina told defendant they could go downstairs to the lobby. Defendant responded "Baby, I don't want nobody to see me up here, to call the police on me," so he pushed his way into the apartment. In an effort to determine whether Halina had any money, defendant asked her for change for a $50. She told him she did not have change. Defendant then asked to use the bathroom. After agreeing, Halina told defendant to hurry up so they could go downstairs.

When defendant came out of the bathroom, he said Halina was getting on him about not touching any of her things. According to defendant, she was talking loud and saying she did not want him to steal her belongings. To keep her quiet so the neighbors would not hear and call the police, defendant put his right hand over her mouth and his left hand against the back of her head. He forced Halina into the bedroom, closed the door so no one would hear, and sat on top of her on the floor. So Halina could not scream, defendant attempted to tie a bathrobe belt across her mouth. Because she was struggling, defendant was unable to do this. Halina then stated in a loud voice, "You bastard, what are you doing?" Defendant struck her in the eye with his fist and continued to hit her at least 15 to 20 times. When Halina ceased struggling, defendant took a quilt from the bed and wrapped her in it. He also pulled the phone cord from the wall. Defendant searched for money in her living room and purse but found none. He then wrapped Halina's microwave in a plastic bag and put it in the living room. He went back to the bedroom and saw blood coming from Halina's mouth and nose. He then saw she was attempting to get up so he stomped on her stomach by jumping up and landing on her with his feet. He took the microwave and left the apartment.

When he encountered the security guard in the lobby, he told the guard Halina had gone off on him, pulled a knife, and he was taking his belongings. The security guard advised defendant he could not leave with the package until the guard was sure it was defendant's. Defendant told the guard his mother was waiting outside for him. The guard told defendant they would go out and see. When the guard did not see defendant's mother and asked him about it, defendant stated she must have left.

The guard again insisted they go back inside so he could ascertain that defendant's package was his. Defendant refused to go back in. The guard then asked him which apartment he had come from and defendant replied "501." Defendant said he told the guard the apartment number because he knew Halina was hurt real bad. Defendant then fled.

The security guard from Halina's building, Kevin George, testified on behalf of the State by way of stipulation. According to him, after defendant fled, he called the police. When they arrived at approximately 1:50 a.m., Halina would not let them in because she did not believe they were the police. After the police left, Halina called her neighbor, who then called the security guard. The guard entered Halina's apartment and called the paramedics. The police were called back to the apartment around 4 a.m., but when they arrived, they found that Halina had been taken to the hospital.

Officers Carol Blakely and Alfred King testified that after leaving Halina's apartment around 4 a.m., they went to the hospital and interviewed her in the emergency room. When they asked her what happened, she told them her boyfriend, defendant, had beaten her up and taken her microwave. She also told them where defendant lived.

The police went to defendant's address and found that someone with defendant's last name signed the register at 2:10 a.m. They advised the security guard to call if that person came back downstairs. The police returned to defendant's residence at approximately 7 a.m. When they entered the lobby, defendant was at the security station. The police placed defendant under arrest and read him his *Miranda* rights, which he stated he understood. According to the police, defendant stated, "You are here about Halina. I did it because I needed some drugs." They asked defendant where the microwave was and he told them. After recovering it, they took defendant to the police station.

Detectives Reiter and Spencer interviewed defendant when he arrived at the station. Detective Reiter testified at the suppression hearing and at trial. During the first interview, at approximately 11 a.m., Spencer was present but did not question defendant. Defendant

was given *Miranda* warnings and he stated he wanted to talk because he wanted to get things off his chest. He told the officers he had used cocaine. Defendant then made an oral statement. He also told the officers he only intended to steal money to get cocaine and had not really wanted to hurt Halina. Defendant was interrogated for approximately 40 minutes and then returned to his cell. When this interview ceased, Reiter found out Halina had died during surgery.

Reiter returned to defendant around noon. He found defendant on his knees praying. Reiter took defendant back to the interview room and told him Halina died. Defendant became upset and refused to believe Reiter. Defendant again gave a statement, similar to the first. A short while later, defendant and Reiter were joined by Assistant State's Attorney Scott Anderson. Anderson gave defendant his *Miranda* warnings, to which defendant responded he understood. Defendant again gave an oral statement. Anderson contacted his supervisor, Anita Alvarez, who came to the station. At approximately 3:30 p.m., defendant gave a court-reported confession. Defendant was allowed to read the statement and he made corrections.

Defendant filed motions to suppress both the statement he made to the arresting officers and his court-reported confession. The trial court denied both motions.

## ANALYSIS

### A. *Miranda* Warnings

The material in this section is nonpublishable pursuant to Supreme Court Rule 23.

### B. Voluntariness of Confession—Promise of Leniency

■ Defendant next contends that his court-reported confession was involuntary because promises were made to him to induce his confession. At the end of his confession, the assistant State's Attorney asked defendant whether anyone had made any promises to him and he stated, "You said if I do it this way, I will get less time. I won't get that much time." After the statement was transcribed, defendant was allowed to make corrections. Upon reviewing his statement, defendant directed that the above-quoted statement be changed to read, "You said if I give this statement and tell the truth the judge will see I cooperated, and he might take it into consideration." According to defendant, his confession cannot be voluntary because it was obtained based on a promise, even though slight. He relies on *Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964). Defendant also relies on *People v. Shaw*, 180 Ill. App. 3d 1091 (1989), and *People v. Rhoads*, 73 Ill. App. 3d 288 (1979). According to defen-

dant, although Reiter testified no one made any promises to defendant during the times he was present, the State failed to ask the arresting officers whether they made any promises. In addition, when defendant included this statement in his confession, Reiter, Anderson, and Alvarez were all present and none of them denied that such a promise had been made. Defendant argues that this silence, in a situation where a response was clearly called for, proves the promise was made. The trial court found that no promise was made to defendant.

> " 'It is a fundamental principle of criminal procedure that a confession must be voluntary; otherwise, it is inadmissible. [Citations.] "The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed." [Citations.] A determination of voluntariness requires consideration of the totality of the circumstances. [Citations.] Factors to be considered in making the determination include the age, education and intelligence of the accused, the duration of the questioning, and whether he received his constitutional rights or was subjected to any physical punishment. [Citations.] No single fact is dispositive; the question must be answered on the facts of each case. [Citations.]' " *People v. Oaks*, 169 Ill. 2d 409, 446-47 (1996), quoting *People v. Melock*, 149 Ill. 2d 423, 447-48 (1992).

Because a "voluntariness determination involves resolving conflicts in the facts and questions as to the credibility of witnesses which is best done by the trial court" (*Oaks*, 169 Ill. 2d at 447), the standard on review is whether the trial court's determination as to voluntariness is contrary to the manifest weight of the evidence. *Oaks*, 169 Ill. 2d at 447.

Although the original statement could be problematic, we conclude that the handwritten version is the version to be analyzed. First, Reiter testified defendant was allowed to make changes and testified how those changes were made. Reiter stated that all information to be changed was stricken by Anderson. With regard to the changes requested by defendant, Anderson wrote in the words defendant desired. The changes were written verbatim. Each change was initialled by defendant, Alvarez, Anderson, and Reiter. We also note defendant does not contest that five other substantive changes were made in the same fashion. Thus, the question is whether defendant's handwritten statement, "You said if I give this statement and tell the truth the judge will see I cooperated, and he might take it into consideration," constitutes a promise of leniency that renders defendant's confession involuntary.

"[W]here promises or suggestions of leniency have been made,

the confession is not necessarily inadmissible." *People v. Veal*, 149 Ill. App. 3d 619, 623 (1986). Likewise, "mere exhortations to tell the truth or to make a statement do not, without more, render a subsequent confession inadmissible." *Veal*, 149 Ill. App. 3d at 623. See also *People v. Wipfler*, 68 Ill. 2d 158, 173 (1977); *People v. Taylor*, 58 Ill. 2d 69, 77 (1974). To constitute a promise of leniency, the statement must be coupled with a suggestion of a specific benefit that will follow if defendant confesses. *People v. Eckles*, 128 Ill. App. 3d 276, 278 (1984). See also *People v. Dozier*, 67 Ill. App. 3d 611, 615 (1979) (merely encouraging defendant to tell the truth without informing him of a specific benefit did not render confession involuntary).

Although we have found no authority containing the same language used here, several cases contain language that can be compared. In *Oaks*, the officer told defendant:

"And I'll tell you what. If we go up there and Tonya's telling something different, you're going to end up in front of a judge *** with us saying that you were *** uncooperative and you lied from the beginning. And I don't think you want that.

I really don't think you want that. I mean people make mistakes all the time, but you have to have some remorse and say that there was a mistake and be honest and tell what's going on. And if you don't, a judge is going to see you just as a hard case." *Oaks*, 169 Ill. 2d at 448.

The court found that this statement was not a promise but instead conveyed to defendant that he should tell the truth and if he did not, the trial judge would look unfavorably upon him. See also *People v. Hartgraves*, 31 Ill. 2d 375, 381 (1964) (telling defendant "It would go easier for him in court if he made a statement" was a "mere suggestion of the advisability of making a statement" and did not render defendant's confession involuntary); *People v. Howard*, 139 Ill. App. 3d 755, 758 (1985) (police promise that " 'if [he] told the truth that everything would go right on [him] and stuff like that' " was a statement for defendant to tell the truth that did not render his confession involuntary); *Eckles*, 128 Ill. App. 3d at 277-78 (police statement to defendant that it would be in his best interest to get the truth out as fast as possible and that if defendant told the truth and cooperated, the police would inform the State's Attorney and testify in court as to defendant's cooperation was not promise of leniency because it was open-ended with no promise of a specific result). But see *People v. Ruegger*, 32 Ill. App. 3d 765, 771 (1975) (statement involuntary where police officer told defendant he would "go to bat" for him on such matters as recognizance bond and probation if he confessed).

The cases relied on by defendant are distinguishable. In *Shaw*,

the trial court found defendant's confession involuntary. The appellate court affirmed. Although the officer testified he made no promises to defendant concerning counseling and sentencing alternatives, the report he filled out stated, "When told that he [defendant] could get—probably get help through the courts, he related the following ***." *Shaw*, 180 Ill. App. 3d at 1093. In addition, before defendant signed his statement he added the following sentence, "Jerry Shaw stated he is sorry this happened and that he wants help for himself and the police told him he can get help." *Shaw*, 180 Ill. App. 3d at 1093. Even though the officer told defendant numerous times sentencing was ultimately the trial judge's decision, the court found this statement to be overcome by the officer's other statements concerning alternatives. It found that defendant expressly relied on the officer's promise in making his confession and, thus, his will was overborne. The court distinguished cases in which a promise was made to defendant but where that promise did not have an influence on defendant's decision to confess. In *Shaw*, defendant did not confess until the officer discussed and answered defendant's questions concerning counseling. Therefore, the appellate court found the trial court's decision that defendant's confession was involuntary was not against the manifest weight of the evidence.

In *Rhoads*, the trial court found defendant's statement voluntary even though the officer made a promise that if defendant talked he would try to get him some help. The appellate court reversed. The evidence demonstrated that defendant did not make any statements until the promises were made to him. In addition, defendant's testimony as to the promise was uncontroverted. The court placed great emphasis upon the fact that the police officer who allegedly made the promise did not contest making it. The court found it was improper for the trial court to disregard defendant's uncontroverted testimony.

■ The first part of defendant's statement, "You said if I give this statement," is like *Hartgraves*. This was a mere suggestion to give a statement and cooperate. The second part of defendant's statement, "tell the truth," is clearly an exhortation on the part of the officers that it would be better for defendant to tell the truth and not to lie. Finally, the last part of the statement, "the judge will see I cooperated, and he might take it into consideration," is not a promise by the police that they would do anything on defendant's behalf. There is no evidence, and defendant does not contend, that the police told him that if he talked and confessed, he would receive less time. This portion of the statement is clearly not a promise of a specific benefit that would follow if defendant confessed. It is open-ended, as in *Eckles*.

Based on the above, the trial court's decision finding defendant's confession voluntary was not against the manifest weight of the evidence.

## C. Knowing and Intelligent Waiver of *Miranda*—Substance Abuse

Defendant's third contention is that he was unable to knowingly and intelligently waive his *Miranda* rights due to his substance abuse. Defendant contends that his expert's opinion that defendant was unable to understand and unable to waive his *Miranda* rights was carefully considered and reasoned as opposed to the State's expert's opinion, which was without basis.

Extensive evidence was presented concerning defendant's mental state. Officer Blakely testified that, when she spoke to defendant, he was responsive to questions, spoke in complete sentences, did not slur his speech, and did not appear to be under the influence.

Officer King filled out the arrest report in which he wrote that defendant was intoxicated at the time of arrest. Defendant had told King he had been drinking and taking cocaine. King noticed that defendant's eyes were red, his clothes ruffled, and he looked unkempt.

Detective Reiter testified that, when he spoke to defendant, defendant spoke in complete sentences and his answers were responsive. Defendant was calm and did not slur his speech. He did not exhibit any involuntary shakes and his eyes were not bloodshot.

At the end of his confession, defendant stated, "I was under the influence of drugs during this whole ordeal"; "I was high," and "When you use drugs you don't forget what you do, [but] you have no control over what you do."

The defense presented Dr. Jeffery Teich, a physiatrist and specialist in alcohol and drug abuse, to state whether defendant was capable of knowingly and voluntarily waiving his rights. Dr. Teich examined defendant on July 8, 1993. Dr. Teich opined that defendant was not capable of understanding the meaning of the *Miranda* warnings based on his 20-year history of drug and alcohol abuse, treatment for same, seizures, depressive disorder, and low mental capacity, which was borderline mentally retarded. According to him, defendant ingested $300 to $400 worth of cocaine and two pints of Wild Irish Rose that night.

Dr. Teich also opined that defendant was intoxicated at the time of his arrest. According to Dr. Teich, defendant's intoxication was so extreme he would suffer from hallucinations that could last days. Defendant also suffered from paranoia and agitation due to his condition, which would lead such an individual to become "extremely

impulsive," "highly prone to violent acts," and "unable to consider the consequences of his behavior."

According to Dr. Teich, at the time of defendant's arrest, he had ingested a large quantity of cocaine, consumed alcohol, and was taking desipramine (an anti-depressant), all of which combined to render defendant incompetent. The cocaine would impair defendant's ability to exercise judgment and he would not be able to comprehend what he was being told. The desipramine would enhance the cocaine intoxication. The combination of cocaine and alcohol would leave defendant with no ability to reason. Dr. Teich opined that, given the condition defendant was in, it was "essentially impossible for him to properly understand [the *Miranda*] rights."

Dr. Teich further testified that some of the statements in defendant's confession could not have been made by him because he did not speak English that well. He further indicated that many of defendant's responses were only minimally responsive.

Finally, Dr. Teich stated that the State's expert did not have a sufficient basis or information to render an opinion as to whether defendant was intoxicated at the time of his confession or whether he was able to voluntarily and knowingly waive his *Miranda* rights.

In rebuttal, the State called Dr. Stafford Henry, a psychiatrist ordered by the court to evaluate defendant. Dr. Henry evaluated defendant on June 8, 1994. Dr. Henry opined that defendant was able to knowingly and voluntarily waive his rights. He based his opinion on the fact defendant was extremely belligerent and uncooperative during his interview, which he found to be intentional and not caused by mental illness. Dr. Henry also stated that an individual with defendant's IQ, 75, would have the intellectual capacity to understand *Miranda* warnings. Finally, when Dr. Henry evaluated defendant, defendant recounted the offense, was deceptive and manipulative, and would do whatever he needed in order to get what he wanted.

The evidence also showed that twice in the police reports defendant indicated he understood the *Miranda* warnings. Defendant had experience with the criminal justice system and had previously appeared before the court, had his rights explained to him, and waived them.

The trial court denied defendant's motion, finding that, although he used alcohol and drugs on the night of the murder, his answers to questions were responsive and contained a detailed description of the evening's events. It concluded that defendant's substance abuse did not so impair him as to prevent him from being able to understand and waive his *Miranda* rights.

The fact a defendant is under the influence of alcohol or drugs

at the time of a confession does not automatically render his or her confession inadmissible. *People v. Foster*, 168 Ill. 2d 465, 476 (1995). Defendant's statement will be suppressed on the grounds of intoxication or drug use only if, when the statement was made, defendant was so grossly intoxicated as to be incapacitated. *People v. Matthews*, 205 Ill. App. 3d 371, 409 (1990). The evidence must clearly demonstrate that, because of his condition, defendant lacked capacity to waive his rights. When proof is less, this goes to the weight of the confession, not its admissibility. *People v. Dodds*, 190 Ill. App. 3d 1083, 1092 (1989).

In *People v. Moore*, 208 Ill. App. 3d 515 (1990), defendant challenged the validity of his confession based on his drug-intoxicated condition and psychotic behavior. He presented the opinions of two psychiatrists who stated that defendant committed the crime as a result of his drug ingestion. The court rejected defendant's claim that he was so mentally impaired at the time of his confession that he could not understand his rights as they were given to him. Several witnesses observed defendant and his demeanor was calm. Defendant was lucid before, during, and after commission of the offense. He provided the police and assistant State's Attorney with detailed information as to what occurred. After being given his rights, he stated he understood them and explained what events occurred. Defendant was calm and cooperative during the interrogation. Finally, when confronted with the fact he was telling the police a lie, he quickly changed his story to conform to the evidence the police suggested they had. The court found that the above acts were not the acts of an individual whose will was overborne and that they did not support a finding that defendant was so mentally impaired.

In the case before us, there is sufficient evidence to support the trial court's determination that defendant was capable of understanding and waiving his *Miranda* rights. Defendant's contention that the trial court improperly placed greater emphasis on the State's expert's testimony is without merit. The credibility and weight to be given psychiatric testimony are for the trier of fact to determine. The ultimate issue is for the trial court and not for the experts. *People v. Haynes*, 174 Ill. 2d 204, 231 (1996), citing *People v. Mahaffey*, 166 Ill. 2d 1, 18 (1995), and *People v. Bilyew*, 73 Ill. 2d 294, 302 (1978).

Moreover, the trial court did not base its decision entirely on the expert testimony. The court's decision also relied on defendant's responsiveness during questioning, his detailed description of events, his vivid recollection of conversations, and the fact he was lucid and alert. There is ample evidence in the statement to demonstrate defendant did not

clearly lack capacity to understand and waive his rights. The statement includes numerous manipulative and clever acts by defendant. First, it shows defendant deceived the guard, George, in obtaining entry to Halina's apartment. The statement also details several manipulative acts involving Halina: getting into the apartment; attempting to ascertain whether she had any money; and stalling to find something to sell. Defendant also told McDonald, the security guard at his building, he had not done it, his twin brother had. Finally, defendant told George, the guard at Halina's building, he had come from 501 because he knew Halina was hurt "real bad." Defendant's own statement and the words he used are the best evidence of his capabilities. The statement was taken verbatim and defendant included direct quotations from many conversations. He included extensive detail as to his activities and actions. These actions demonstrate defendant was not so under the influence of alcohol and cocaine that he was incapable of understanding. Clearly there is enough information in the statement for the trial court to draw the inference that defendant was not so impaired that he was unable to understand his rights.

Finally, the totality of the circumstances supports the trial court's finding. Defendant was 33 years old. Although defendant ingested alcohol and cocaine before his arrest, his first interview by the police was not until four hours later and his court-reported statement was not until $8^{1}/_{2}$ hours after his arrest. There were no allegations of physical abuse against defendant by the police. And, although Officer King's report indicated defendant was intoxicated at the time of his arrest, none of the individuals who interviewed defendant testified they observed problems or that he was under the influence of anything.

For the foregoing reasons, the trial court's decision is not against the manifest weight of the evidence.

### D. Excited Utterance
The material in this section is nonpublishable pursuant to Supreme Court Rule 23.

### E. Lesser Included Offenses
The material in this section is nonpublishable pursuant to Supreme Court Rule 23.

### F. Excessiveness of Extended Sentence
The material in this section is nonpublishable pursuant to Supreme Court Rule 23.

### G. Aggravating Factors—Substance Abuse
The material in this section is nonpublishable pursuant to Supreme Court Rule 23.

## H. Correction of Mittimus

The material in this section is nonpublishable pursuant to Supreme Court Rule 23.

## I. Harmless Error

The material in this section is nonpublishable pursuant to Supreme Court Rule 23.

## CONCLUSION

For the foregoing reasons, defendant's convictions and sentences are affirmed and the common law record is corrected to reflect defendant was sentenced to 10 years for residential burglary.

Affirmed.

ZWICK, P.J., and LEAVITT, J., concur.