2018 IL App (3d) 130270

Opinion filed February 21, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois. |
|---|---|---|
| Plaintiff-Appellee, | ) ) | Appeal No. 3-13-0270 |
| v. | ) ) | Circuit No. 11-CF-268 |
| DEMETRIUS PHILLIPS, | ) ) | The Honorable Walter Braud, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion.
Justice Holdridge dissented, with opinion.

**OPINION**

¶ 1       The defendant, Demetrius Phillips, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2010); 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2010)) and was sentenced to 25 years of imprisonment. On appeal, Phillips argues *inter alia*, that his statement to police was improperly coerced such that the circuit court erred when it denied his motion to suppress. We reverse and remand.

¶ 2                                                FACTS

¶ 3        Jasmine Anderson gave birth to a son on July 23, 2010. Phillips was the minor's father, and the family lived together in an apartment. Phillips did not have a job, and he would watch the minor when Anderson was at work. The minor died under suspicious circumstances on December 10, 2010; while in the hospital for the two weeks prior to the minor's death, it was learned that the minor had multiple injuries, some of which were recent and some of which were old. His injuries included two skull fractures, fractured clavicles, hemorrhaging behind an eye, and bleeding on the brain. The doctor who performed the autopsy testified that the minor died as result of blunt force trauma.

¶ 4        On March 30, 2011, Phillips was charged by information with first degree murder. Phillips was arrested and taken to the Rock Island Police Department where he was interviewed and ultimately made an inculpatory statement to the police.

¶ 5        On July 15, 2011, Phillips filed a motion to suppress his statement to police. Phillips argued that he did not give the statement knowingly and voluntarily and that it was "the result of coercion, deceit, trickery, and false promises on behalf of the investigators."

¶ 6        At the hearing on the motion, the recordings of Phillips's interview were introduced into evidence. In total, three police officers had questioned Phillips during the interview: Benjamin Meiresonne, Larry Hufford, Jr., and Leo Hoogerwerf. No more than two of them were in the interview room at any given time with Phillips. The interview lasted from approximately 11 a.m. to 3:30 p.m. and included breaks for the restroom, food, and water. Phillips, who was then 18 years old, did not have an attorney or family member present at any time during the interview.

¶ 7        At the outset of the interview, Phillips was shown a copy of the first degree murder charge and was told that he was under arrest. Phillips began to cry. Phillips was told that this was his last chance to tell the detectives what had been going on. Phillips asked to see his mother

2

several times over the next few minutes, but those requests were denied. He was told that he could see his mother once the interview was done. Phillips was told that the detectives were there to help him, not to hurt him, and Phillips was read his *Miranda* rights. Phillips said that he understood those rights, and he was told to sign a sheet of paper that indicated he understood the rights as they were read to him. Phillips signed the sheet without any attempt at reading it first.

¶ 8        Over the next approximately 45 minutes, Phillips and the officers discussed what had transpired with the minor over the week leading up to his death. It was after this discussion that the detectives took a more aggressive approach to the interview. Phillips was told that the cause of the minor's death was not an accident and that the minor had been shaken. For the next hour or so, Phillips continually denied that he shook or otherwise injured his son.

¶ 9        At around 1:15 p.m., which was over two hours into the interview, Hufford entered the room and began aggressively interrogating Phillips. Variously, Hufford told Phillips that he was trying to save Phillips's life and that a lot of things could change going forward, including the first degree murder charge. Hufford also asked Phillips if he knew what happened to baby killers in prison and stated that Phillips's life would not last long as a baby killer in prison. Hufford also told Phillips that unless he told the truth, neither God nor the minor would forgive him.

¶ 10        At approximately 1:29 p.m., Phillips asked if he could have a few minutes. Approximately 10 minutes later, he began telling the detectives about how he could not get the minor to stop crying so he tossed the minor onto the bed. However, he bounced off the bed, hit his head on the nightstand, and fell to the floor. Later, after Phillips had further discussed the incident with the detectives, he was allowed to see his mother. During their brief time together, Phillips's mother asked him several times whether he told the truth to the police. Phillips either answered no or shook his head to indicate no every time she asked him that question. Phillips's

3

mother was escorted out of the interrogation room shortly thereafter, and one of the detectives asked Phillips why he had lied to his mother. Phillips said that he did not lie to her.

¶ 11    Meiresonne was the first of the three officers to testify at the hearing. He testified that during the investigation into the minor's death, on several different occasions, Phillips voluntarily provided the officers with varying suggestions of how the minor could have been fatally injured. Meiresonne stated that on one such occasion, Phillips requested to speak with him and another detective to tell them that he had done research and reviewed the minor's prior medical records. He presented the officers with information on spina bifida and hydrocephalus as possible explanations of the bleeding in the minor's brain. Meiresonne noted that the format in which the information was provided was comparable to a research paper. He stated that he had, however, investigated and learned from medical records and from a doctor that the minor did not have spina bifida.

¶ 12    Meiresonne further testified that at the start of the interview Phillips knew he was under arrest. He had been provided a copy of the arrest warrant that listed the charge of first degree murder and a $1 million bond. Meiresonne noted that this warrant could be seen on the interview table in the video. Additionally, he stated that Phillips was calm, collected, and polite before entering the interview room, but after being informed he was under arrest for murder, he became visibly upset and cried loudly.

¶ 13    Meiresonne noted that he advised Phillips of his *Miranda* rights, both verbally and in writing, prior to the start of the interview and that Phillips waived those rights. He indicated that Phillips had no questions, demonstrated no confusion or lack of understanding of his rights, and at no time requested to have an attorney present or to end the interview. Phillips appropriately answered questions related to his age (18) and grade level (eleventh) at that time. Meiresonne

4

stated that he "was articulate, polite" and "appeared to understand what was going on." He said Phillips had been given *Miranda* warnings on four prior occasions and on this occasion Phillips reviewed the written *Miranda* warnings for about 30 seconds before signing the waiver. The signed *Miranda* waiver was admitted into evidence without objection.

¶ 14  Meiresonne testified that he never told Phillips he would be free to leave if he told the officers what happened to the minor or that he would not be prosecuted. He acknowledged telling Phillips that "you can talk to your mother when we're done. We've called her and told her to come get you in a little while, all right?" and that "this is your last opportunity to tell us what happened." He stated that he had misspoken regarding Phillips's mother coming to get him and said that he had assured Phillips multiple times throughout the interview that he would be allowed to talk to his mother. Meiresonne stated that he had a theory of what had happened and affirmed that a truthful answer from Phillips would be his admission to having committed a violent act upon the minor. However, he stated that he did not invite Phillips to confess in exchange for seeing his mother. He noted that if Phillips had invoked his constitutional rights, the interview would have ended.

¶ 15  Meiresonne acknowledged that he heard Hufford say to Phillips, "[w]hat do you think is going to happen to you in prison? It [is] mandatory life, and your life won't be long as a baby killer in prison. Stay online when you get a chance in the county jail, and see what happens to baby killers in jail."

¶ 16  After several hours of questioning, Meiresonne stated Phillips admitted that he injured the minor on November 22, 2010. He told the officers that Anderson was at work and he was alone with the minor. Because the minor was fussy and could not be consoled, he tossed the minor onto the bed. The minor bounced off the bed, hit his head on the nightstand, and fell to the

5

floor. Phillips picked up the minor, called Anderson to obtain the medical card, and took him to the emergency room. Meiresonne stated that Phillips told him the minor was slipping in and out of consciousness, crying, and vomiting. After he confessed, Phillips asked if he was going to see his mother. Meiresonne said he told him that he would be allowed to speak with her.

¶ 17    Hufford was the next officer to testify. He authenticated the video recording of the interview for admission. He then testified that Phillips had been arrested on March 30, 2011, right after he had appeared in court on an unrelated civil matter. He went through regular booking procedures and was placed in a locked interview room for some time before Meiresonne and Hoogerwerf arrived.

¶ 18    Hufford stated that Meiresonne was the lead investigator and that no single officer was present for the entire interview. He noted that he did not personally enter the interview room until after a couple of hours into the interview but that he had observed the interview over the video feed from the start. He stated that Phillips was given the first degree murder arrest warrant, which also stated the bond amount, and received *Miranda* warnings. He noted that Phillips signed the *Miranda* waiver and did not indicate a lack of understanding or that he did not wish to participate in the interview. Hufford stated that Phillips appeared to be sober, healthy, and able to understand the interview. He characterized Phillips as extremely articulate and noted his own son, who was the same age and attended school with Phillips, was not as articulate or intelligent. Hufford testified "there was nothing even close" to an indication Phillips lacked understanding or wished to stop the interview.

¶ 19    Hufford further testified that during the six-month investigation preceding Phillips's arrest and interview, he had advanced differing causes of how the minor could have been injured.

He noted that Phillips suggested yet another possibility of how the minor could have been injured during the interview prior to admitting that he injured the minor.

¶ 20    Hufford admitted that he was angry during the interview. He acknowledged that he made the statement regarding what would happen to Phillips in prison and admitted his words were a "little rash." He said his purpose was to elicit the truth, to "invoke [*sic*] an answer." Hufford stated that in making the statement he meant that "it was going to be rough for [Phillips]" and "that his life wouldn't be much as an 18-year-old person, as a baby killer, as I say in there, in prison. People don't respect those kind of people."

¶ 21    Hufford testified that this was a fraction of his full statement and that at the time he had made the statement he was "done with the *** made-up stories" and was "trying to be in his face, get his mind thinking about how serious it is that he's sitting there." Hufford said "at no point was [he] ever trying to scare him or threaten him to say something." Hufford stated:

> "Shortly after the context where it says: 'See what happens to baby killers in jail you show no'—I was speaking to [Phillips]. And I was saying: 'you show no remorse whatsoever, and that makes me angry, because you're the same age as my son. And I just had a long talk with your mom, you know what she told me? I told her that I would talk to her when—that you could talk to her when you were done, and she said: you tell him to tell the truth. I said: ma'am, we've been trying to make him tell the truth for six months. It's out of my hands now.
>
> By not telling the truth, not only are you losing your life, [the minor is] gone, and you can't tell—finally tell the truth and

7

make him come back. You can't make up some story and make them come back. But you can explain to the public and the citizens of the State of Illinois why this happened and why you have remorse, if you have any, or if you do. There are things that need to be explained to the people.' "

¶ 22 Hufford stated he was attempting to tap into Phillips's guilt to get him to show remorse and let go of what he was keeping inside in hopes that it would all go away. He testified that "at no time ever did [Hufford] say, 'say something, say anything, so we can go home' *** There was nothing even close to that ever said anywhere." He repeatedly told Phillips he wanted the truth. Hufford stated Meiresonne rubbed Phillips's shoulders and gave him water; he also purchased a pizza for Phillips, which went uneaten.

¶ 23 Hufford discussed Phillips's physical state as he was confessing to injuring the minor. He stated that Phillips began crying and "was sinking down, his body was just collapsing. You could see this leaving his body. He's just letting it out finally."

¶ 24 Regarding Phillips's request to see his mother, Hufford testified that standard tactics are to prevent a parent from entering the room until the interview concludes. He stated that Phillips's mother was ultimately allowed into the interview room after he had confessed and the interview had ended. Hufford stated that he heard part of Phillips's conversation with his mother. He testified that his "mom was telling [Phillips] on the video camera to tell the police something else other than what he'd been saying." Hufford said he then reentered the room and told Phillips's mother that she had to leave.

8

¶ 25    Hoogerwerf also testified; his testimony largely corroborated the testimony of Meiresonne and Hufford. Hoogerwerf also stated that he believed Phillips understood the circumstances and that Phillips freely waived his *Miranda* rights.

¶ 26    The suppression hearing was continued to August 15. The circuit court stated for the record at the outset of the second day of the hearing that it had viewed the recordings of the interview. Both parties indicated they were satisfied with the court's representation that it had viewed the recordings, and Phillips had no objection.

¶ 27    Phillips then testified. He stated that on April 30, he was in court for a misdemeanor violation of an order of protection and was arrested as he was leaving the hearing on that matter. He was transported to the Rock Island Police Department where he subsequently met with and was interviewed by multiple officers.

¶ 28    Phillips acknowledged that prior to questioning, Meiresonne read him his *Miranda* rights, read the arrest warrant informing him that he was under arrest for the murder of the minor, and informed him that his bond had been set at $1 million. He noted Meiresonne also placed the warrant on the interview room table and said, "we're just trying to get more closure for the story. We're trying to figure out exactly what happened." Phillips testified that he skimmed over the *Miranda* waiver and signed it "like in previous interrogations." He acknowledged on cross-examination that he was familiar with the interrogation room and what occurred there and that he had been provided with *Miranda* rights waiver forms on four prior occasions when speaking with the officers.

¶ 29    Phillips testified that he recalled being asked "[w]hat you think is going to happen to you in prison? It's mandatory life and your life won't be long as a baby killer in prison. Check the history papers, stay online if you get a chance in the county jail and see what happens to baby

9

killers in jail." Phillips stated he believed this was an assurance that he would be murdered in prison.

¶ 30        He further testified that in response to his numerous requests to speak with his mother, the officers told him he could speak with her when the interview concluded and that they had called and told her she could get him in a little while. During direct examination, Phillips stated that because he had been free to go after his previous interviews, he believed he would be released after this interview as well. However, on cross-examination, Phillips said he knew he was under arrest and was not free to leave. He stated that "there was no way" the police were going to let him leave following the interview. He further admitted that he knew he would not be free to leave after having confessed to harming the minor.

¶ 31        Phillips asserted that he told the officers the truth—that he had not injured the minor— but the interview continued, and he felt the officers were looking for a specific answer. He stated he "provided them with information to the best of [his] knowledge and at that point the interrogation wasn't over, so [he] felt like [he] at least had to give them a satisfactory answer ***  before [he] could see [his] mom."

¶ 32        He recalled being told "you don't get punished and injustices for telling the truth, you get into trouble for doing something intentional or accidental and showing no remorse." He testified that he interpreted this to mean, "[the officers] were trying to tell [him] if [he] can give [the officers] some closure for this situation, then maybe [the officers] can help [him] out." This was a new situation for him; he was afraid, and he had not secured an attorney. So, he made up a story during the interview. He stated "[he] felt like the answer they were going for was that [he] had done something to [his] son."

10

¶ 33    After describing his actions to the police regarding the minor, Phillips stated that he was allowed to see his mother. He testified to the interaction he had with his mother and stated that he told her that what he told the police was not the truth. When she began to tell him to explain that to the police, Hufford entered the room and told his mother to leave. Phillips testified that his mother had not coerced or threatened him into saying his admission was a lie.

¶ 34    Following the testimony of Phillips's mother and closing arguments, the circuit court found:

> "[D]efendant is young, that he's 18 years of age, but that he is intelligent. That for probably three hours and 50 minutes, of the four hours and 15 minutes that he had been questioned, he was comfortable, he was in control, he was articulate, he was up to the task of resisting many multiple requests by the interrogating officers for him to come clean. So I find that the atmosphere of the interrogation was not coerced. *** Whether or not Phillips was able to speak to his mother, is not a factor, and I find it not be a factor because he's not a juvenile. Even if you were a juvenile, under these facts, I would not find it made the confession involuntary."

¶ 35    The circuit court found that Phillips knew from having received *Miranda* warnings on four prior occasions that he had a right to an attorney and that he could stop the interview at any time. The court observed the officers spent a lot of time telling Phillips he needed to be remorseful and found that the "baby killer statement was made in connection with remorse that nonremorseful defendants are treated differently than remorseful defendants."

11

¶ 36 Regarding whether Phillips recanted, the circuit court found that he had failed to respond three or four times to his mother's questions concerning whether his confession was truthful. The court noted "where we judge people's demeanor as witnesses, when you failed to answer a claim that is harmful to you, that's a yes."

¶ 37 The court found that the interview was appropriate, there were no coercive threats or demands made, and Phillips's will had not been overcome. It found the confession to be voluntary and denied the motion to suppress. The matter was set for a jury trial.

¶ 38 Following the presentation of extensive evidence, the jury found Phillips guilty of first degree murder as charged. He was sentenced to 25 years of imprisonment with 3 years of mandatory supervised release.

¶ 39 After his motion to reconsider his sentence was denied, Phillips appealed.

¶ 40                                         ANALYSIS

¶ 41 On appeal, Phillips argues, *inter alia*, that his statement to police was improperly coerced such that the circuit court erred when it denied his motion to suppress.

¶ 42 The due process clause of the fourteenth amendment guarantees that a state may not deprive an individual of liberty without due process of law. U.S. Const., amend. XIV, § 1. The United States Supreme Court has stated that it "has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

¶ 43 "It is *** axiomatic that the defendant's constitutional rights have been violated if his conviction is based, in whole or in part, on an involuntary confession, regardless of its truth or falsity. [Citations.] This is so even if there is ample evidence aside from the confession to

12

support the conviction [citations]." *Miranda v. Arizona*, 384 U.S. 436, 464 n.33 (1966). If an individual's " 'will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' " *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

¶ 44      The test for determining whether a confession was voluntary is " 'whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed.' " *People v. Slater*, 228 Ill. 2d 137, 160 (2008) (quoting *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996)).

> "In determining whether a statement is voluntary, a court must consider the totality of the circumstances of the particular case; no single factor is dispositive. Factors to consider include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the presence of *Miranda* warnings; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises." *People v. Richardson*, 234 Ill. 2d 233, 253-54 (2009).

At a hearing on a motion to suppress, it is the State's burden to prove, by a preponderance of the evidence, that a confession was voluntary. 725 ILCS 5/114-11(d) (West 2010); *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). We apply a bifurcated standard of review to a circuit court's decision on a motion to suppress: (1) we grant great deference to the court's factual findings and will

disturb them only if they are against the manifest weight of the evidence; and (2) we review *de novo* the court's ultimate legal ruling on the motion to suppress. *Braggs*, 209 Ill. 2d at 505.

¶ 45    Regarding Phillips's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning, we find that these factors weigh in favor of a finding that the confession was voluntary. The evidence presented on these factors, including the video of the interrogation, showed that 18-year-old Phillips was intelligent and articulate, and he had experience with the criminal justice system in that he had been interviewed by police several times prior to the interrogation in which he confessed. He had an eleventh grade level education and had no apparent physical impairments.

¶ 46    Additionally, the duration and legality of the detention, as well as the duration of the questioning, weigh in favor of a finding that the confession was voluntary, as the interrogation was conducted postarrest, took place in an interrogation room at the police station, featured no more than two officers at one time, lasted under four hours (including breaks for the restroom and food and drink), and was conducted in the middle of the day. Further, the interrogation did not begin until after Phillips had been read his *Miranda* rights and he signed the waiver form, factors which also weigh in favor of a finding that the confession was voluntary.

¶ 47    However, the remaining factors—any physical or mental abuse by police, including the existence of threats or promises—weigh strongly in favor of a finding that Phillips's confession was not voluntary. First, Hufford's statement regarding the charge changing was indicative of improper coercion. Hufford told Phillips:

> "I'm trying to save your life, okay? *** None of us here
> want you to go to prison forever. We don't want you to die. We
> don't want any bad thing to happen to anybody, especially an 18-

14

year-old kid that made a mistake. But by you giving this type of interview, the people will see later—you show absolutely no remorse. Okay? We're not asking you anymore, did you kill [the minor]. That, that part of the investigation's over. Okay? We've already showed enough probable cause in front of attorneys and judges that you killed [the minor]. Okay? We're giving you a chance to save your life. You know what that charge carries right? They told you what the sentence was. I heard them. Okay? That's not even the number of years. That's till you die. Okay? The only reason, just because that's your charge, that doesn't mean that's the finalized thing that's going to happen. There's a long time before you're sentenced and you're found guilty. There's a lot of time. A lot of things can change, including that charge, if the truth is brought out. And if it comes out of your mouth."

¶ 48    This court has stated that "[t]o constitute an offer of leniency that renders a confession inadmissible, a police statement must be coupled with a suggestion of a specific benefit that will follow if the defendant confesses." *People v. Kellerman*, 342 Ill. App. 3d 1019, 1027 (2003). In this case, Hufford's statement included a suggestion of a specific benefit—that the charge could change. Contrary to the State's assertion, this is not like other cases in which a comment by police was open-ended and not a promise of a specific benefit. See *People v. Johnson*, 285 Ill. App. 3d 802, 809 (1996) (holding that a police comment that a judge would see the defendant's cooperation and might take that into account was not a promise of a specific benefit); *People v. Eckles*, 128 Ill. App. 3d 276, 277-78 (1984) (holding that a police comment that they would

15

inform the state's attorney and the court of the defendant's cooperation was not a promise of a specific benefit). Rather, we find this case to be similar to two other cases in which confessions were held to be involuntary.

¶ 49    In *People v. Heide*, 302 Ill. 624, 628 (1922), our supreme court held that a confession was involuntary when the police told the suspects that "it would be better for them to tell the truth, and *** that they would be taken to the State's attorney's office and would be allowed to make a statement; that the State's attorney might show them leniency." The court concluded that "[t]he natural effect on the minds of the [suspects] of such statements by the officers would be to cause them to feel that they were being advised to speak, and that if they told the truth they would be taken to the State's attorney's office and allowed to make a statement, and then whatever he did for them would be better for them on account of their telling the truth." *Id.* at 628-29.

¶ 50    In *People v. Ruegger*, 32 Ill. App. 3d 765, 771 (1975), the Fourth District stated that "[a]lthough it is undisputed that the police officers made no definite promises to defendant, defendant's version of the conversation was that the police officers conveyed to him the impression that they would 'go to bat' for him on such matters as a recognizance bond and probation if he confessed to everything." Noting the "unusual factor" that the defendant's interrogator was a relative, the court held that the totality of the circumstances of the defendant's interrogation led to the conclusion that his confession was involuntary. *Id.*

¶ 51    Here, the detectives did not tell Phillips that they would *recommend* a lowering of the charge. Certainly, the detectives did not clarify that the prosecutor was the only one who could lower the charge. Rather, the clear import of Hufford's statement was that the defendant could

16

avoid the first degree murder charge if he confessed, which weighs in favor of finding the confession involuntary.

¶ 52     Second, the "baby killer" comments indicate improper coercion. The following statements were made to Phillips:

> HUFFORD: "You don't get punished in this justice system for telling the truth. You get punished by doing an accident or doing something intentional and showing no remorse. Those people are called killers. And what do you think happens to baby killers in prison? What do you think is going to happen? You're eighteen."
>
> MEIRESONNE: "It's mandatory life."
>
> HUFFORD: "And your life won't be long as a baby killer in prison. Check the history papers. Stay online when you get a chance in the county jail. See what happens to baby killers in jail. You show no remorse whatsoever and that makes me angry."

Which was followed moments later with:

> MEIRESONNE: "When you get convicted of this and you go over for sentencing in front of that judge, every judge wants to send a baby killer to prison forever."

While the circuit court dismissed these comments as harmless because they were "made in connection with remorse that nonremorseful defendants are treated differently than remorseful defendants," we find the court's finding misplaced. These "baby killer" statements were threats of physical violence that case law has reasonably found to be indicative of improper coercion.

See *People v. Murdock*, 2012 IL 112362, ¶ 30 (holding that "[t]hreats or promises made by the police may be considered physical or mental abuse"); *Arizona v. Fulminante*, 499 U.S. 279, 286-87 (1991) (holding that a credible threat of physical violence in prison was sufficient to find that a confession had been coerced); see also *Dye v. Commonwealth*, 411 S.W.3d 227, 234 (Ky. 2013) (holding that "attempting to persuade a seventeen-year-old that a confession is the only way he will avoid daily prison assault—sexual or otherwise—is 'objectively coercive' " (quoting *Henson v. Commonwealth*, 20 S.W.3d 466, 469 (Ky. 1999))).

¶ 53    The statements made to Phillips regarding the charge changing and what happens to baby killers in prison must be considered in light of the totality of the circumstances. *Richardson*, 234 Ill. 2d at 253-54. Thus, we also note that numerous comments were made to Phillips that the officers were trying to help him and/or save his life. They also told him that he was too young to go to prison for the rest of his life and that "when a person is truthful and honest and tells the police what happened, that goes a long way as it goes down through the court system. One of the things that the courts really like is the fact that somebody takes responsibility for their actions."

¶ 54    We also note that numerous comments were made to Phillips regarding forgiveness and faith. For example, Meiresonne told Phillips that "You have to let it go. You have to tell us. For your own self-preservation, in the eyes of God and everyone else." Hufford stated, "[e]verybody will forgive you if you tell the truth." Hufford also stated, "[a]ren't you scared of God? Because God will never forgive you if you don't tell the truth. [The minor] will never forgive you. You're going to see him someday." We acknowledge that cases exist in which pleas to faith and/or God were made and the confessions were still found to be voluntary. See, *e.g.*, *People v. Bowen*, 87 Ill. App. 3d 221, 226-27 (1980). However, cases such as *Bowen* still recognize that the voluntariness of a confession depends on an examination of the totality of the circumstances. *Id.*

18

at 227. Moreover, precedent exists to support the consideration of religious pleas that were made by police in conjunction with extracting a confession. See, *e.g.*, *Williams v. Brewer*, 375 F. Supp. 170, 184 (1974), *aff'd on other grounds*, 509 F.2d 227 (8th Cir. 1974), *aff'd*, 430 U.S. 387 (1977). We find that the types of pleas made to Phillips in this case are not only relevant to our analysis, but also indicative of improper coercion.

¶ 55    Considering the multiple instances of coercive conduct employed by the police in this case, we find that the factors weighing in favor of a finding of involuntariness outweigh the factors indicating the contrary, and we therefore hold under the totality of the circumstances of this case that Phillips's confession was involuntary. In arriving at this conclusion, we also note that the court's finding that Phillips failed to respond three or four times to his mothers' questions regarding the truthfulness of his confession is against the manifest weight of the evidence. The video clearly shows that Phillips either said no or shook his head to indicate no in response to his mother's questions about whether he told the police the truth. Regardless, whether Phillips was lying or telling the truth—indeed, whether he in fact harmed the minor and/or caused the minor's death—is irrelevant. See *Miranda*, 384 U.S. at 464 n.33 ("It is *** axiomatic that the defendant's constitutional rights have been violated if his conviction is based, in whole or in part, on an involuntary confession, regardless of its truth or falsity. [Citations.] This is so even if there is ample evidence aside from the confession to support the conviction [citations].""). What matters is whether Phillips's will had been overborne by improper means. See *Schneckloth*, 412 U.S. at 225-26; *Slater*, 228 Ill. 2d at 160. For the foregoing reasons, we hold that it was.

¶ 56    We are mindful of the undoubtedly tragic circumstances of this case. However, the quest for justice for the minor cannot justify the violation of Phillips's constitutional rights. Under the

19

circumstances of this case, we hold that the circuit court erred when it denied Phillips's motion to suppress his statement to police. We remand the case for further proceedings consistent with this opinion.

¶ 57        Our resolution of this issue obviates the need to address Phillips's remaining arguments on appeal.

¶ 58                                              CONCLUSION

¶ 59        The judgment of the circuit court of Rock Island County is reversed, and the cause is remanded for further proceedings.

¶ 60        Reversed and remanded.

¶ 61        JUSTICE HOLDRIDGE, dissenting.

¶ 62        I dissent. In my view, the State proved that Phillips's confession was voluntary. As the majority acknowledges, the duration and legality of Phillips's detention, as well as his age, intelligence and experience with the criminal justice system (including prior interviews with the police), all weigh in favor of finding that the his confession was voluntary. *Supra* ¶¶ 45-46. Nevertheless, the majority holds that Phillips's confession was rendered involuntary due to certain coercive threats and promises of leniency made by the interrogating police officers. I disagree. In my view, the interrogating officers promised neither leniency nor protection from violence in exchange for Phillips's confession, and none of the police statements relied upon by the majority amount to a compulsion or inducement sufficient to overcome the defendant's free will. I will address each of the police statements at issue in turn.

¶ 63        First, the majority concludes that Officer Hufford's statement regarding the possibility that the charge brought against the defendant could change if the defendant confessed and showed remorse is "indicative of improper coercion" and weighs in favor of finding Phillips's

confession involuntary. However, as the majority correctly notes, "[t]o constitute an offer of leniency that renders a confession inadmissible, a police statement must be coupled with a suggestion of a *specific benefit that will follow if the defendant confesses*." (Emphasis added.) *People v. Kellerman*, 342 Ill. App. 3d 1019, 1027 (2003); see also *People v. Johnson*, 285 Ill. App. 3d 802, 808 (1996). For example, in *Kellerman*, the court held the defendant's confession to be involuntary where the defendant claimed the police told him during his interrogation that the state's attorney was on the phone and was prepared to offer him a negotiated plea agreement if he confessed. *Kellerman*, 342 Ill. App. 3d at 1027. In this case, the interrogating officers offered no such specific benefit. Neither Officer Hufford nor any of the other police officers promised that the charge against Phillips would be reduced if he confessed. Officer Hufford merely stated that "a lot of things can change, including the charge, if the truth is brought out" and if it "comes out of your mouth." The thrust of Officer Hufford's statement was that it would be better for Phillips if he confessed because the authorities generally look more favorably on defendants who tell the truth and show remorse and that the charge *might* be lowered if Phillips did so. This open-ended, generic statement does not constitute a promise of a specific benefit of leniency. Courts have repeatedly held that such statements do not render a defendant's confession involuntary.[1]

---

[1]See, *e.g.*, *People v. Hartgraves*, 31 Ill. 2d 375, 381 (1964) (telling defendant " '[i]t would go easier for him in court if he made a statement' " was a "mere suggestion of the advisability of making a statement" and did not render defendant's confession involuntary); *People v. Howard*, 139 Ill. App. 3d 755, 758 (1985) (police promise that " 'if [he] told the truth that everything would go right on [him] and stuff like that' " was a statement for defendant to tell the truth that did not render his confession involuntary); *People v. Eckles*, 128 Ill. App. 3d 276, 277-78 (1984) (police statement to defendant that it would be in his best interest to get the truth out as fast as possible and that if defendant told the truth and cooperated, the police would inform the state's attorney and testify in court as to defendant's cooperation was not promise of leniency because it was open-ended with no promise of a specific result); *Johnson*, 285 Ill. App. 3d at 806, 809-10 (telling defendant that if he gave a statement and told the truth the judge will see he cooperated and " 'might take it into consideration' " was "not a promise by the police that they

¶ 64    The cases upon which the majority relies are distinguishable or inapposite (or both). In *People v. Ruegger*, 32 Ill. App. 3d 765, 771 (1975), the defendant's interrogator was a relative and the police officers allegedly gave the defendant the impression that they would " 'go to bat' " for him on such matters as a recognizance bond and probation if he confessed. Here, by contrast, none of the interrogating officers were relatives, and no officer made any promise to do anything for the defendant. Rather, Officer Hufford merely suggested that things would go better for the defendant and the charge might be reduced if he confessed truthfully and showed remorse.

¶ 65    In *People v. Heide*, 302 Ill. 624, 626, 628-29 (1922), our supreme court held that the defendant's confession was obtained under duress, and was therefore involuntary, where the police told him that "it would be better for him to tell the truth" and that "if he did he would be taken to the State's attorney's office and the State's attorney would do the best for him." In so holding, the *Heide* court applied the test for determining the voluntariness of a confession previously announced by the United States Supreme Court in *Bram v. United States*, 168 U.S. 532 (1897). Under that test, a confession obtained under "any promise or hope of immunity" was deemed involuntary where "any degree of influence" was used to obtain the confession by a person having authority over the crime charged or over the person of the defendant. *Heide*, 302 Ill. at 627; see *Bram*, 168 U.S. at 543 ("A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted." (Internal quotation marks omitted.)). The *Bram* test is no longer good law. See *Arizona v. Fulminante*, 499 U.S. 279, 285

would do anything on defendant's behalf" or that the defendant would receive less time if he confessed; it was merely an "open-ended" statement that did not render the defendant's confession involuntary).

(1991) ("[a]lthough the Court noted in *Bram* that a confession cannot be obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence, [citation] *** this passage from *Bram* *** does not state the standard for determining the voluntariness of a confession" under current precedent (internal quotation marks omitted)). Under current law, we measure whether a confession was unconstitutionally coerced by the totality of the circumstances (*Fulminante*, 499 U.S. at 285), and we examine whether the defendant's will was overborne by the circumstances surrounding the giving of the confession, taking into consideration both the characteristics of the accused and the details of the interrogation (*Dickerson v. United States*, 530 U.S. 428, 434 (2000); *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)). Thus, *Heide* applies an obsolete legal standard and is therefore inapposite. In any event, the instant case is distinguishable from *Heide*, which involved a specific promise that the state's attorney would "do the best" for the defendant if he confessed. No such specific promise of leniency or benefit was offered to Phillips in this case.

¶ 66    The majority also holds that the interrogating officers' "baby killer comments" indicate improper coercion. At one point during the interrogation, Officer Hufford asked the defendant, "what do you think happens to baby killers in prison?" and then told him, "your life won't be long as a baby killer in prison." Immediately thereafter, Officer Meiresonne told the defendant that "[w]hen you get convicted of this and you go over for sentencing in front of that judge, every judge wants to send a baby killer to prison forever." Officer Meiresonne also told the defendant that the sentence for baby killers was "mandatory life." Citing *Fulminante* and other cases, the majority holds that these statements (taken together with the officers' suggestions that Phillips might get a lighter sentence if he told the truth, expressed remorse, and took

23

responsibility for his actions) rendered Phillips's confession involuntary because they conveyed threats that Phillips would be the victim of physical violence in prison unless he confessed.

¶ 67     Again, I disagree. Credible threats of physical violence may render a confession involuntary but only if the defendant is offered protection from the threatened violence in exchange for his confession. See *Fulminante*, 499 U.S. at 283-84, 287-88 (confession was rendered involuntary where government agent induced defendant to confess to murdering a child by offering him protection from further violence in prison in exchange for the defendant's confession); *Payne v. Arkansas*, 356 U.S. 560, 561, 564-65, 567 (1958) (confession was coerced because the interrogating police officer had promised that if the accused confessed, the officer would protect the accused from an angry mob outside the jailhouse door). Where no such promise is offered, a credible threat of violence does not affect the voluntariness of a confession. See, *e.g.*, *State v. Sanders*, 13 P.3d 460, 466 (N.M. 2000) (although FBI agent communicated a credible threat to the defendant of violence from a drug organization, the defendant's confession was voluntary and admissible because "the FBI made no offer of protection in exchange for [the defendant's] cooperation" and all of the other circumstances supported the voluntariness of the confession); *Haak v. State*, 695 N.E.2d 944, 948 (Ind. 1998) (rejecting defendant's argument that his confession was rendered involuntary by credible threats of violence from a drug organization where the defendant "[did] not point to any evidence showing that he was promised immunity from possible reprisals against himself or his family if he confessed").[2] In this case, the interrogating officers told Phillips he would not live long in prison as a baby killer, but they did not offer him any protection in exchange for his confession. Although they vaguely suggested that Phillips might obtain a lesser sentence if he told the truth and expressed remorse, they never

---

[2] The *Haak* court ruled that *Fulminante* was "inapposite" because "it involved a trade of benefit— protection—for the suspect's discussing the crime." *Id.*

24

stated or implied that Phillips could avoid violent attacks in prison if he confessed. The interrogating officers urged Phillips to confess to the murder of a baby, told him that baby killers do not last long in prison and that "every judge wants to send a baby killer to prison forever," and never promised that Phillips could avoid a prison sentence or prison violence by confessing. In my view, these statements did not coerce or induce Phillips to confess. If anything, they might have *discouraged* him from confessing.

¶ 68      Finally, the majority finds that the religious pleas that the officers made to the defendant also amounted to improper coercion. For example, Officer Meiresonne told Phillips that "You have to let it go. You have to tell us. For your own self-preservation, in the eyes of God and everyone else." Officer Hufford stated, "[a]ren't you scared of God? Because God will never forgive you if you don't tell the truth. [The minor] will never forgive you. You're going to see him someday." He also told Phillips that "[e]verybody will forgive you if you tell the truth."

¶ 69      The overwhelming weight of authority establishes that such appeals to God, faith, or divine forgiveness do not render a confession involuntary. In *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the defendant was Mirandized and interrogated for several hours, during which time he remained largely silent. Thereafter, one of the interrogating detectives asked the defendant whether he believed in God. *Id.* at 376. The defendant said " 'yes,' " and his eyes welled up with tears. *Id.* The detective then asked him whether he prayed to God, and the defendant again responded, " 'yes.' " *Id.* The detective then asked the defendant " '[d]o you pray to God to forgive you for shooting that boy down?' " *Id.* The defendant answered, " 'yes,' " and looked away. *Id.* The defendant was later charged with first degree murder and other offenses. He moved to suppress the statements made during the interrogation, arguing that he had invoked his fifth amendment right to remain silent, that he had not waived that right, and that his inculpatory

25

statements were involuntary. The United States Supreme Court held that the defendant had voluntarily waived his *Miranda* rights by responding to the interrogating officers' questions. The Court also held that "[t]he fact that [the interrogating detective's] question referred to [the defendant's] religious beliefs *** did not render [the defendant's] statement involuntary" because "[t]he Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." (Internal quotation marks omitted.) *Id.* at 387. Several other courts have reached the same conclusion on similar facts, including the Illinois Appellate Court. See, *e.g.*, *People v. Bowen*, 87 Ill. App. 3d 221, 226 (1980) (holding that defendant's confession to the murder of his children was not involuntary, even though the defendant confessed only after the police chief exhorted him to "make peace with yourself, your God, and your children," where there was no evidence of psychological coercion; ruling that "mere exhortation to tell the truth does not render inadmissible a subsequent confession" (internal quotation marks omitted)); see also *State v. Graham*, 733 S.E.2d 100, 105 (N.C. Ct. App. 2012). Without some evidence of physical or psychological coercion, mere references to God or faith coupled with exhortations to tell the truth and to seek God's forgiveness do not render a defendant's confession involuntary. *Berghuis*, 560 U.S. at 387; *Bowen*, 87 Ill. App. 3d at 226; *Graham*, 733 S.E.2d at 105.

¶ 70 Although the majority acknowledges *Bowen*'s holding, it cites *Williams v. Brewer*, 375 F. Supp. 170, 184 (1974), for the proposition that religious pleas made by the police in conjunction with extracting a confession may be considered as evidence of improper coercion. *Supra* ¶ 54. However, *Williams* does not support the majority's holding in this case. As an initial matter, the *Williams* court's statements regarding the involuntary nature of the defendant's confession were *dicta* because the court had already decided to grant the petitioner's federal *habeas corpus*

26

petition based upon the police officer's violation of the defendant's fifth amendment rights under *Miranda*. Moreover, *Williams* is distinguishable. The tactics employed by the interrogating officers in *Williams* were far more coercive than those used by the officers in this case. In *Williams*, police officers (1) interrogated the defendant extensively during a 160-mile car trip in violation of their agreement with the defendant's counsel not to question the defendant during the trip, (2) refused to allow the defendant's counsel to accompany him during the trip, (3) ignored the defendant's repeated statements that he would talk after he saw his attorney, (4) with full knowledge of the defendant's religious nature and history of mental illness, used a psychological approach which purposefully played on religion and on the defendant's sympathies, (5) used deceptive tactics to trick the defendant into confessing, and (6) purposefully interrogated the defendant during the car ride to obtain incriminating statements from him before he could speak with his attorney. Williams, 375 F. Supp. at 184. The police employed no such improper tactics during Phillips's interrogation. The majority cites no Unites States Supreme Court case or Illinois case finding a confession involuntary where, as here, the interrogating officers merely referenced a defendant's belief in God and exhorted the defendant to tell the truth in order to obtain God's forgiveness. Nor have I found any such case.

¶ 71 In my view, the police statements identified by the majority, considered either individually or collectively, did not render Phillips's confession involuntary. Accordingly, the trial court's finding that Phillips's confession was voluntary was not against the manifest weight of the evidence. I find the remaining issues raised by Phillips to be meritless. I would therefore uphold the trial court's judgment denying Phillips's motion to suppress.

27