NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210627-U

NO. 4-21-0627

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 13, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| DEMARR M. MEYERS, | ) | No. 17CF1102 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, holding that (1) the trial court did not err in denying defendant's motion to suppress his confession and (2) defendant did not receive ineffective assistance of trial counsel.

¶ 2   Defendant, Demarr M. Meyers, appeals his convictions for first degree murder, armed robbery, and being an armed habitual criminal. Defendant argues the trial court erred in denying his motion to suppress his confession. Defendant also argues his trial counsel provided ineffective assistance by failing to (1) introduce allegedly exculpatory evidence, (2) perfect impeachment of witnesses, (3) challenge allegedly improper business records, and (4) preserve the suppression issue for appeal. We affirm.

¶ 3                              I. BACKGROUND

¶ 4 Defendant was charged with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(3) (West 2016)) in that he, or a person for whom he was legally accountable, caused the death of Eric Robertson by discharging a firearm. One of the four counts was later dismissed. Defendant was also charged with aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), attempted armed robbery (*id.* §§ 8-4, 18-2(a)(2)), being an armed habitual criminal (*id.* § 24-1.7(a)), and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a), (e)). The public defender's office was appointed to represent defendant. Defendant subsequently filed a motion to proceed *pro se*, which the trial court allowed.

¶ 5                                             A. Motion to Suppress

¶ 6 Defendant, *pro se*, filed a motion to suppress his confession pursuant to section 114-11(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-11(a) (West 2018)). The motion alleged detectives used "[t]rickery and coercion to compel a forced confession in violation of the defendants [*sic*] fifth and sixth (U.S.C.A.) [amendment rights]." Defendant attached an affidavit to the motion to suppress which stated the detectives had made promises of leniency during the interview by saying they would talk to the State's Attorney about "everything" rather than charging him with something that day, they would "go to bat" for defendant, and defendant could get "potentially years of [his] life back."

¶ 7 The trial court held a hearing on the motion to suppress on May 23, 2019, and June 12, 2019.  Over the course of the hearing, detectives Bryan Henson and Timothy Zajicek testified about an interview they conducted with defendant on October 19, 2017. They indicated that, at the time of the interview, defendant was in custody on an unrelated matter and was on parole for home invasion. He also had a prior conviction for residential burglary. Defendant was 29 years old at the time of the interview. According to the detectives, defendant's physical

condition and mental capacity appeared normal. They provided him with food, water, bathroom breaks, and cigarettes during the interview.

¶ 8　　　　　The trial court admitted a video recording of defendant's interview into evidence and later viewed it. The recording was 5 hours and 18 minutes long, but the interview itself was approximately 2 hours and 40 minutes in length. At the beginning of the interview, Henson read defendant his *Miranda* rights, and defendant indicated he understood. After a 20-minute discussion of an unrelated incident, Zajicek asked defendant if he had any information about Robertson's death, and defendant said he did not. The detectives indicated they believed defendant was involved in the homicide.

¶ 9　　　　　Defendant continued to deny involvement in Robertson's death for approximately 90 minutes. During that time, the detectives told defendant that prosecutors and sentencing courts had discretion, and someone who was honest and took accountability "look[ed] a lot better" than someone who lied and "denie[d] it." At one point, Zajicek stated he could not promise defendant anything, but he believed if he was able to tell the State's Attorney defendant had been honest, it would be "taken into consideration." The detectives repeated several times that, if defendant gave a statement, he could potentially get "time back on [his] life" or "years of [his] life back." At one point, Zajicek told defendant they already knew what happened, but defendant could put a "human aspect on it." Zajicek also told defendant twice that he could not "hurt [himself]" at that point because "what's done is done."

¶ 10　　　　At one point, Henson told defendant the detectives were giving him the "opportunity" to help himself. When defendant asked what he meant, Zajicek explained, "The opportunity is, when the people that make decisions, they're going to look at our reports. They're going to ask us what was said. Judges, lawyers, prosecutors, cops, even." Henson stated,

"Juries." Zajicek continued: "Parents, teachers, when you're a kid, yeah. Everyone knows that people make mistakes. But a lot of how those mistakes are dealt with have to do with how you act and react. And—and this is about doing the right thing."

¶ 11　　　　The detectives repeatedly told defendant they wanted to hear his version of events so they could "go to bat" for him and help him. During one of these instances, Zajicek asked defendant to let the detectives "have a chance to go to bat for [him]," and defendant replied, "You at bat ain't gonna [*sic*] get me home." Henson responded, "Get you home sooner."

¶ 12　　　　At one point, Zajicek told defendant they had already made their case, but they did not know what was "going through [defendant's] head" during the incident. Defendant said that would not change the amount of time in prison he received, and Henson replied, "Oh, yeah, it will. Remember what we said? Different charges."

¶ 13　　　　At various points during the interview, defendant appeared to be attempting to ascertain the extent of the evidence against him. Over the course of the approximately 90 minutes during which defendant denied involvement in the homicide, he asked what he would be charged with, whether he would be "locked up," and whether he had been indicated as the shooter.

¶ 14　　　　After almost two hours of questioning, defendant stated that, on the day of the incident, Shawntase Day and Marcus Barber came over to his house. They planned to rob a dice game, and defendant was "made the driver." Defendant initially said he stayed in the car while Day and Barber went to rob the dice game, but he later admitted he went to the scene of the shooting with Day and Barber. They parked Barber's car in the driveway of a house on Jackson Street, and Day gave defendant a silver gun. They had a second silver gun and a black gun as well. The black gun belonged to Day, but defendant saw both Day and Barber hold it. All three

- 4 -

of them wore masks. They walked over to the house they planned to rob, and "some dude ran up." Barber chased him and shot him. Day also fired his gun, but defendant did not fire his gun. They ran back to the house on Jackson Street and left in the car a minute or two later. Defendant marked on a map where he, Day, and Barber were at the time of the shooting. Defendant also drew the route they took back to the car afterward and marked where the car had been parked.

¶ 15 The trial court denied the motion to suppress. The court stated: "Based off the totality of the circumstances, I—I do not think the Defendant's will was overcome and I do not think it was an involuntary statement, and the Motion to Suppress is denied."

¶ 16 B. Trial

¶ 17 On February 6, 2020, attorney Marcus Schantz entered his appearance on behalf of defendant. The matter proceeded to a bench trial.

¶ 18 At the trial, the State's evidence showed that, at approximately 11 a.m. on August 12, 2017, Robertson was shot during a dice game in front of a residence at 1703 East Edwards in Springfield, Illinois (the Edwards Street house), and he later died from the gunshot wound. A detective recovered from the scene two .45-caliber cartridge casings, which were later determined to have been fired from the same gun, and one .40-caliber cartridge casing. An employee at a nursing home near the Edwards Street house testified she heard three to five gunshots at approximately 11 a.m. on the day of the incident. A few seconds later, she saw two people wearing black and red running toward Jackson Street.

¶ 19 Quinton Grant and Mark Ballard were among the group of men present at the dice game at the time of the shooting. Grant testified at trial, and Ballard's audio recorded interview with a detective was admitted into evidence. Grant and Ballard indicated that, on the morning of the incident, an individual approached the dice game and started shooting. Grant only saw one

shooter, who was wearing a mask and a red hooded sweatshirt. Grant saw the individual shoot Robertson in the back. Robertson ran, and the shooter chased him while continuing to shoot. Ballard saw two men with guns. One was tall and wearing a red hooded sweatshirt and a mask. The second man was short and not wearing a mask.

¶ 20 Shawntase Day testified he had pending charges related to the instant case but had been granted use immunity for his testimony. Day stated that, on the morning of the incident, Ballard and Robertson each called him and said they were "shooting dice" at the Edwards Street house and were losing. Robertson asked Day to rob the dice game so they could get their money back. Day called Michael Ross because he knew Michael committed robberies. Michael was unable to participate in the robbery that day because he did not have a ride. Day walked to defendant's house and told defendant he had a "lick" for him, which meant a robbery. Barber then drove up in a black Monte Carlo and said he had just come from the dice game. Day told defendant and Barber his friends wanted the dice game to be robbed.

¶ 21 Day gave Barber his .40-caliber Glock to use during the robbery. Day, Barber, and defendant drove in the black Monte Carlo to a house at 1727 East Jackson Street (the Jackson Street house). They pulled into the driveway, and Day entered the house. Defendant and Barber stayed outside. A few minutes later, Day heard three or four gunshots. A couple minutes after that, Barber and defendant, both carrying guns, ran into the Jackson Street house. Defendant said Barber had been shooting. They left approximately one minute later.

¶ 22 Jannie Freemon testified that she lived next door to the Jackson Street house. At approximately 11 a.m. on the day of the incident, she heard several gunshots. She looked out the window and saw two black men wearing dark-colored clothing. They were both wearing hooded sweatshirts. One was short, and his hood was up. The other was tall, and his hood was down.

They ran to the Jackson Street house and drove away in a black car. Freemon identified Barber in a photographic lineup as one of the men.

¶ 23    Michael Ross testified that, on the morning of the incident, he was at the house of his sister, Jackie Ross. Day called Michael and asked him to participate in a robbery, but Michael did not participate because he was not "available to get there." During cross-examination, defense counsel asked Michael if he remembered calling Jackie from jail after he was arrested in August 2017, giving her his Facebook password, and asking her to delete a number of Facebook posts. Michael said he did not remember.

¶ 24    Jackie testified that she picked Michael up at approximately 7 a.m. on the day of the incident and drove him to her house. He remained there until 4 or 5 p.m. She did not remember receiving a call from Michael after he was arrested in August 2017. She said Michael did not give her his Facebook password and ask her to delete any posts.

¶ 25    Jerome Henderson testified Day called him on the day of the incident and asked if the door was unlocked at the Jackson Street house. Day indicated he wanted to rob someone.

¶ 26    Ambrosia Renicks, defendant's half-sister, testified defendant told her on the morning of the incident that he, Day, and an individual she later learned was named Marcus were planning to rob a dice game. Robertson called Renicks that morning, and she warned him someone was going to rob the dice game.

¶ 27    Zajicek testified he was the lead detective in the investigation of Robertson's homicide. Zajicek eventually identified defendant, Barber, and Day as possible suspects. He determined defendant was five feet, four inches tall, Barber was approximately six feet tall, and Day was six feet tall. Zajicek interviewed defendant during his investigation. A redacted recording of the interview, which included the portion of the interview during which defendant

discussed his participation in the incident, was admitted into evidence. The map defendant marked during the interview was also admitted.

¶ 28 Zajicek testified he obtained cellular phone records for phones belonging to Day and Robertson. The records were admitted into evidence without objection. According to Zajicek, the records showed that, on the morning of the incident, Day's phone had been in contact twice with a phone Zajicek believed was owned by Michael Ross and once with a phone owned by Henderson. Robertson's phone records showed that there were outbound calls to Renicks's phone at 10:47 a.m. and 10:48 a.m. on the morning of the incident.

¶ 29 Zajicek also reviewed security video footage from a nearby Western Union from the day of the incident, which showed "[l]ots of vehicle and pedestrian traffic in the area." The video showed two individuals riding bicycles, and one of them was wearing a red shirt.

¶ 30 On cross-examination, defense counsel asked Zajicek if he had reviewed recordings of phone calls made by Michael Ross after he was arrested in August 2017. Zajicek said he had listened to these recordings. In one of the recordings, Michael called Jackie, gave her his Facebook password and "told her to delete his Facebook." Defense counsel asked if Michael subsequently called Day and told him to make sure Jackie did what he told her to do. Zajicek replied, "I recall something to that effect, yes."

¶ 31 The trial court admitted into evidence certified copies of defendant's prior convictions for residential burglary and home invasion. The State then rested.

¶ 32 Defense counsel called Detective Michael Flynn as a witness. Flynn testified he spoke with Judy Bell in connection with the instant case. Bell lived near the Edwards Street house and was in her backyard at the time of the shooting. She heard gunshots and saw several individuals run from the Edwards Street house. A black male wearing a red shirt ran to the east,

and a couple other black males headed west. A few minutes later, she saw a man on a bicycle who was wearing a red shirt. The bicyclist looked similar to the man Bell had seen run from the Edwards Street house.

¶ 33 Flynn stated he reviewed security camera footage from the Western Union near the Edwards Street house, and the video was played in court. At 11:15 a.m. on the day of the incident, the footage showed a black male on a bicycle who was wearing a red or pink shirt. The parties had stipulated to the foundation for the Western Union video, but neither party moved to admit it into evidence.

¶ 34 During closing argument, defense counsel argued Jackie Ross "perjured herself" when she denied a phone call took place where Michael instructed her to "delete his Facebook."

¶ 35 The trial court found defendant guilty of three counts of first degree murder and further found, with respect to each of the three counts, defendant had personally discharged a firearm. The court also found defendant guilty of aggravated discharge of a firearm, attempted armed robbery, being an armed habitual criminal, and unlawful possession of a weapon by a felon.

¶ 36 Defendant filed a posttrial motion requesting that the court vacate his convictions and order a new trial. The trial court denied the motion but found that aggravated discharge of a firearm, unlawful possession of a weapon by a felon, and two counts of first degree murder merged for purposes of sentencing pursuant to the one-act, one-crime doctrine. The court imposed consecutive sentences of 45 years' imprisonment for first degree murder, 4 years' imprisonment for attempted armed robbery, and 6 years' imprisonment for being an armed habitual criminal. This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, defendant argues the trial court erred in denying his motion to suppress his confession. Defendant also argues his trial counsel provided ineffective assistance in that counsel (1) failed to introduce allegedly exculpatory evidence, (2) failed to perfect impeachment of witnesses, (3) failed to challenge allegedly improper business records, and (4) failed to preserve the suppression issue for appeal. We address each argument in turn.

¶ 39                    A. Motion to Suppress

¶ 40    Defendant argues the trial court erred by denying his motion to suppress his confession. Defendant contends his confession was involuntary because his will was overborne by the detectives' promises of leniency. Specifically, defendant argues the detectives said they would "go to bat" for him if he gave a statement; giving a statement could not "hurt;" making a statement could result in him getting "years of his life back;" the State's Attorney, judge, and jury would look on him more favorably if he gave a statement; and they would be "more inclined" to talk to the State's Attorney rather than charging him that day since he was talking to them. Defendant notes he was interrogated for approximately two hours before giving his statement.

¶ 41    Initially, defendant acknowledges he forfeited this issue by failing to raise it in a posttrial motion. However, he contends we should review it under the constitutional issue exception to the forfeiture rule because he moved to suppress his confession on the basis that it was obtained in violation of his fifth amendment rights. The State concedes the constitutional issue exception applies in this case. Our supreme court has held that "constitutional issues that were properly raised at trial and may be raised later in a postconviction petition" are not subject to forfeiture for failing to file a posttrial motion. *People v. Cregan*, 2014 IL 113600, ¶ 16.

¶ 42 Here, defendant's motion to suppress stated that his confession was obtained "in violation of [his] fifth and sixth (U.S.C.A.)," which we construe as alleging that his confession was obtained in violation of his rights under the fifth and sixth amendments to the United States Constitution (U.S. Const., amends. V, VI). Accordingly, we accept the State's concession, and we proceed to consider defendant's suppression claim under the constitutional issue exception.

¶ 43 "Where the defendant challenges the admissibility of an inculpatory statement by filing a motion to suppress, the State bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary." *People v. Salamon*, 2022 IL 125722, ¶ 84. On review, we will reverse the trial court's factual findings only if they are against the manifest weight of the evidence. *Id.* ¶ 75. However, "the ultimate legal determination as to whether suppression is warranted is reviewed *de novo*." *Id.*

¶ 44 "The rule prohibiting the admission of an involuntary confession is rooted in the self-incrimination clause of the fifth amendment [citation] and the due process clause of the fourteenth amendment." *Id.* ¶ 76. "To ascertain the admissibility of a confession under either amendment, courts consider whether the defendant's confession was voluntary and will exclude a confession that is involuntary." *Id.* "[T]he test of voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996). "The voluntariness of a confession depends on the totality of the circumstances of the particular case, and no single factor is dispositive." *Salamon*, 2022 IL 125722, ¶ 81.

> "The relevant factors include the defendant's age, intelligence, background,
>
> experience, mental capacity, education, and physical condition at the time of

questioning. [Citation.] In addition, courts consider the legality and duration of the detention, the duration of the questioning, the provision of *Miranda* warnings, and any physical or mental abuse by police, including the existence of threats or promises." *Id.*

¶ 45        "Confessions induced by promises or suggestions of leniency have been held involuntary." *People v. Veal*, 149 Ill. App. 3d 619, 623 (1986). In order to constitute a promise of leniency, an officer's statement " 'must be coupled with a suggestion of a specific benefit that will follow if [the] defendant confesses.' " *People v. Henslick*, 2022 IL App (4th) 200481, ¶ 37 (quoting *People v. Johnson*, 285 Ill. App. 3d 802, 808 (1996)). There is no "promise of leniency" if the benefit the defendant will purportedly reap from confessing is left open-ended. *Id.* "Advising a defendant that, judicially or otherwise, telling the truth would be the most beneficial course of action is not a promise of leniency in return for a confession." *Id.* ¶ 38. See also *People v. Hartgraves*, 31 Ill. 2d 375, 381 (1964) (holding that a police officer telling the defendant " '[i]t would go easier for him in court if he made a statement' " was not a promise of leniency and did not render the defendant's confession involuntary); *Johnson*, 285 Ill. App. 3d at 809 (holding that a police officer telling the defendant that, if he made a statement, the judge would see he cooperated and " 'might take it into consideration' " was not a promise of a specific benefit).

¶ 46        "[E]ven where promises or suggestions of leniency have been made, the confession is not necessarily inadmissible." *Veal*, 149 Ill. App. 3d at 623; *People v. Robinson*, 286 Ill. App. 3d 903, 906 (1997). Rather, "[t]he ultimate question is whether, considering the totality of the attendant circumstances, defendant's will was overcome at the time he confessed." *Veal*, 149 Ill. App. 3d at 623.

¶ 47          In the instant case, many of the detectives' statements to defendant were "mere suggestion[s] of the advisability of making a statement." *Hartgraves*, 31 Ill. 2d at 381. For example, Zajicek said he could not promise defendant anything, but he believed if he was able to tell the State's Attorney that defendant was honest about everything, it would "be taken into consideration." Similarly, Zajicek told defendant that someone who was honest and took accountability "look[ed] a lot better" to prosecutors and sentencing courts than someone who lied and "denie[d] it." The detectives also vaguely indicated that people like judges, lawyers, prosecutors, police officers, juries, parents, and teachers "dealt with" mistakes based on "how you act and react." Such comments could possibly be interpreted as an invitation for defendant to accept responsibility for his actions. However, we cannot say they constituted promises of leniency as argued by defendant.

¶ 48          We also find the officer's statements that defendant giving his version of events could not hurt was not a promise of leniency. The detectives indicated that giving a statement could not "hurt" because "what's done is done." They told defendant they already had evidence he was involved in the offense and giving a statement would help by showing the "human aspect" of what happened. Viewed in context, the detectives' comments were mere suggestions of the advisability of making a statement.

¶ 49          Additionally, defendant contends the officers promised him a specific benefit when they said they would talk to the prosecutor instead of charging him immediately since he was cooperating with them. The recording reflects that, early in the interview, Zajicek told defendant he would be "more inclined" to talk to the prosecutor rather than charging him with something that day since defendant was talking to the officers. However, before defendant gave a statement concerning the homicide, Zajicek clarified that defendant would not be charged with

anything related to the homicide that day and that charging decisions would be made the next day. Accordingly, the possibility of delayed charging could not have induced defendant's confession.

¶ 50        During the interview, the detectives told defendant on multiple occasions that they wanted to hear his version of events so they could "go to bat" for him. During all but one of these instances, the detectives vaguely indicated they would "go to bat" for defendant when they talked to the State's Attorney without suggesting any specific benefit that defendant might receive from this advocacy. This left the benefit defendant might reap from giving a statement open-ended, and, accordingly, these statements did not constitute promises of leniency. See *Henslick*, 2022 IL App (4th) 200481, ¶ 37.

¶ 51        However, on one occasion when Zajicek indicated he wanted to "go to bat" for defendant, defendant stated that Zajicek "at bat" would not "get [him] home." To this, Henson replied, "Get you home sooner." This suggested defendant would receive the benefit of potentially serving less time in prison if the detectives went "to bat" for him, and, consequently, it arguably constituted a specific promise or suggestion of leniency. The detectives also suggested a specific benefit in exchange for defendant's statement when they said defendant could receive less time in prison due to "[d]ifferent charges" if he told them what was "going through [his] head" during the incident.

¶ 52        Despite these suggestions of specific benefits, we find, considering the totality of the circumstances, defendant's will was not overcome at the time he confessed. At the time of the interview, defendant was 29 years old. He had extensive prior experience with the criminal process, as he was on parole for home invasion and had a prior conviction for residential burglary. Henson and Zajicek testified defendant appeared to have a normal mental capacity and

to be in a normal physical condition. Defendant was provided with food, water, bathroom breaks, and cigarettes during the interview. The interview was not particularly long, as it lasted under three hours. Henson gave defendant *Miranda* warnings at the outset of the interview. Throughout the interview, defendant appeared to be trying to ascertain what evidence the detectives had against him and weighing whether it would be beneficial to him if he gave a statement, ultimately concluding it would. Also, viewing the detectives' comments in their totality, we find the detectives clearly conveyed that they could not promise defendant lesser charges and that this decision was ultimately made by the prosecutor. Under these circumstances, the State met its burden of showing by a preponderance of the evidence that defendant's statement was voluntary.

¶ 53　　　　　In reaching our holding, we note that defendant relies heavily on the decision in *People v. Ruegger*, 32 Ill. App. 3d 765 (1975) in support of his argument that his confession was involuntary. In *Ruegger*, the defendant was interviewed for 20 minutes by two officers, one of whom was his uncle, and he confessed to several burglaries. *Id.* at 767. He filed a motion to suppress his confession. *Id.* At the suppression hearing, the defendant testified one of the officers told defendant that he had gotten probation for one of defendant's friends. *Id.* The defendant said the officer told him he could not promise anything, but if the defendant would " 'keep [his] nose clean,' " the officer would " 'go to bat' " for him. *Id.* The defendant also testified the officers "showed him the statute book designating the penalties for various offenses and told him that if he confessed to everything he would be charged with only some of the offenses." *Id.* at 767-68. The defendant stated the officers also told him they would help him get released on a recognizance bond. *Id.* at 768. The defendant testified he confessed because the officers offered to help him. *Id.* The officers disputed the defendant's version of the interview. *Id.*

¶ 54        The trial court in *Ruegger* granted the defendant's motion to suppress, and the State appealed. *Id.* The appellate court held the trial court's determination that the State had not met its burden of showing defendant's confession was voluntary was not against the manifest weight of the evidence. *Id.* at 771. In reaching its holding, the *Ruegger* court considered the totality of the circumstances of the confession, including that the defendant was an 18-year-old high school student, the defendant was "familiar with the criminal process," the defendant had twice indicated he did not wish to answer any questions before he confessed, and there was no lengthy interrogation or indication of physical coercion. *Id.* at 770-71. The *Ruegger* court found that none of these factors "appear[ed] decisive" and stated the issue was "whether the evidence, considered in the light most favorable to the defendant, indicate[d] that the police officers did not merely suggest that it would be advisable for defendant to tell the truth but persuaded him that if he made a statement he would be treated more leniently." *Id.* at 771. The court stated:

>        "Although it is undisputed that the police officers made no definite promises to defendant, defendant's version of the conversation was that the police officers conveyed to him the impression that they would 'go to bat' for him on such matters as a recognizance bond and probation if he confessed to everything. In addition, the unusual factor that defendant was interrogated by a relative may have added an element of subtle compulsion to confess." *Id.*

¶ 55        We find *Ruegger* to be distinguishable from the instant case. First, the procedural posture in *Ruegger* differs from the instant case. In *Ruegger*, the State appealed the trial court's order granting the defendant's suppression motion, arguing the decision was against the manifest weight of the evidence. *Id.* at 770-71. As a result, the *Ruegger* court viewed the suppression evidence in the light most favorable to the defendant. *Id.* at 771. Here, however, the opposite

- 16 -

situation exists where defendant is appealing the denial of his suppression motion. Thus, unlike in *Ruegger*, defendant here must overcome the highly deferential manifest weight standard as to the trial court's factual findings.

¶ 56        *Ruegger* is also factually distinguishable from the instant case. Unlike in *Ruegger*, where the defendant was an 18-year-old high school student, defendant was 29 years old at the time of his interview. The record indicates that, prior to the interview, defendant had obtained his GED. While the teenage defendant in *Ruegger* had some unspecified "familiar[ity] with the criminal process" (*id.* at 770), defendant in the instant case had previously been convicted of two felonies and had served time in prison. Also, unlike in *Ruegger*, the law enforcement officer who questioned defendant was not a family member. Additionally, unlike in *Ruegger*, defendant in the instant case never stated he did not wish to answer any questions.

¶ 57        Also, in *Ruegger*, the officers' statements that they would "go to bat" for the defendant were tied to specific benefits he would reap from their assistance, including a possible sentence of probation and a recognizance bond. In the instant case, with the exception of the one occasion where Henson indicated defendant could receive less time in prison if the officers went "to bat" for him, the benefit defendant would receive from the officers going "to bat" for him was left open-ended.

¶ 58        Due to the foregoing differences in the facts and procedural postures between the instant case and *Ruegger*, we find the holding in *Ruegger* does not mandate a finding that defendant's statement was involuntary.

¶ 59                        B. Ineffective Assistance of Counsel

¶ 60        Defendant argues he received ineffective assistance of trial counsel in that counsel failed to (1) move to admit a video during the trial due to inadvertence, (2) perfect the

impeachment of Michael and Jackie Ross, (3) challenge "facially false business records" offered by the State, and (4) preserve the allegedly erroneous denial of his motion to suppress in a posttrial motion. Defendant contends each of these errors constituted deficient performance, and, considered either individually or cumulatively, the errors prejudiced him.

¶ 61    Claims of ineffective assistance counsel are governed by the standard originally set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36. That is, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

¶ 62                    1. *Failure to Admit Video Recording*

¶ 63    First, defendant argues that his trial counsel was ineffective for failing to move to admit the Western Union security camera footage. This video recording does not appear in the record on appeal, but Zajicek and Flynn testified it showed a man wearing a red or pink shirt and a backpack riding on a bicycle at 11:15 a.m. on the morning of the incident. Defendant contends counsel's failure to introduce the video into evidence was due to inadvertence rather than trial strategy. Defendant notes the parties stipulated to the foundation of the recording, and defense counsel appeared surprised during closing argument to learn the video was never admitted. Defendant argues that he was prejudiced by his counsel's failure to move to admit the video into evidence because, without the video, there was no substantive evidence that a third individual

- 18 -

participated in the robbery who could have discharged one of the firearms rather than defendant. Defendant notes eyewitnesses reported the shooter was wearing red, but Freemon testified the men who ran to the Jackson Street house after the shooting wore dark-colored clothing.

¶ 64       Even if we were to accept defendant's argument that defense counsel performed deficiently in failing to move to admit the video recording, defendant has not shown there is a reasonable probability that the result of the proceeding would have been different. As mentioned, the recording does not appear in the record, but according to Zajicek's and Flynn's testimony, it showed multiple people walking through a busy intersection. One of the individuals depicted was a black male wearing a red or pink shirt riding a bicycle. The video does not establish a third individual participated in the robbery. Based on the record before us, the video would have shown, at most, that a black male wearing a red or pink shirt was present in a busy intersection near the scene of the shooting shortly after the shooting occurred. Thus, defendant has failed to establish the prejudice prong of *Strickland*.

¶ 65                    2. *Failure to Perfect Impeachment*

¶ 66       Defendant also argues his trial counsel provided ineffective assistance where he failed to perfect his impeachment of Michael and Jackie Ross. He argues counsel should have introduced recordings of Michael's jail call to Jackie asking her to delete his Facebook and his call to Day asking him to make sure she did so. Defendant argues Zajicek's testimony concerning these calls was admitted only to show the course of the investigation and not as substantive evidence and, accordingly, counsel failed to perfect his impeachment of Michael and Jackie with extrinsic evidence. Defendant argues he was prejudiced by this because Michael's credibility was not impeached and his "alibi and denials of subsequent attempts to cover up his involvement in the crime went unchallenged by substantive evidence."

¶ 67        After reviewing the record, we disagree with defendant's argument that defense counsel failed to perfect his impeachment of Michael and Jackie with extrinsic evidence. Zajicek's testimony concerning these calls was extrinsic evidence which perfected the impeachment. See *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 45 ("To complete the impeachment when the witness denies making the statement, the impeaching party offers extrinsic evidence showing the witness made the statement."). While some of Zajicek's testimony concerning out-of-court statements of third parties was admitted only to show its effect on the course of the investigation, there is no indication in the record that Zajicek's testimony about the jail calls was admitted for this limited purpose. The State did not object either when Zajicek testified concerning the jail calls or during closing argument when defense counsel argued that Jackie's credibility had been impeached through Zajicek's testimony. There is no indication in the record that the trial court did not consider Zajicek's testimony about the calls as impeachment evidence.

¶ 68        We also note that, contrary to defendant's assertions in his brief, impeachment evidence is not substantive evidence and is only admissible to undermine the credibility of the witness. See *People v. Lewis*, 2017 IL App (4th) 150124, ¶ 35 ("When a witness is impeached with statements made by him out of court, those statements may not be considered for their truth—that is, they do not constitute substantive evidence. The fact that the witness made different, contradictory statements should be used *only* to undermine the credibility of the witness."). Thus, even if the recorded phone calls had been introduced to impeach the credibility of Michael and Jackie, they would not have been substantive evidence (*i.e.*, admitted for their truth).

¶ 69        3. *Failure to Challenge Foundation for Telephone Records*

¶ 70        Defendant argues his counsel was ineffective for failing to object to the admission of cellular phone records for phone numbers purportedly belonging to Robertson and Day. He contends these records were not self-authenticating documents pursuant to Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018) because the accompanying certifications were not signed by the persons purported to be the records' custodians. The State concedes that the records were not properly authenticated and, accordingly, were not admissible. The State contends, however, that defendant was not prejudiced by admission of the records.

¶ 71        Even if we were to find counsel performed deficiently in failing to object to the admission of the cellular phone records, defendant has not shown he was prejudiced by the admission of the records. The records showed only that, on the morning of the incident, (1) there were calls between Day's phone and Michael Ross's phone, (2) there was a call between Day's phone and Henderson's phone, and (3) a call was made to Renicks's phone from Robertson's phone. This evidence was cumulative, as Day, Henderson, and Renicks testified that these calls occurred. While the cellular phone records supported the credibility of this testimony, a reasonable probability does not exist that the result of the trial would have been different if the records had not been admitted.

¶ 72        4. *Failure to Preserve Claim of Error Relating to Denial of Motion to Suppress*

¶ 73        Defendant contends that his trial counsel provided ineffective assistance by failing to ask the trial court to revisit its ruling on the motion to suppress both at trial and in a posttrial motion. However, we find that defendant was not prejudiced by this alleged error. The issue was not ultimately forfeited on appeal, as we have reviewed it herein under the constitutional issue exception. *Supra* ¶ 42. Also, for the same reasons we found the trial court did not err in denying the motion to suppress, a reasonable probability does not exist that the confession would have

- 21 -

been suppressed or that a new trial would have been ordered if counsel had raised the suppression issue again at trial and in a posttrial motion. *Supra* ¶¶ 47-52.

¶ 74                                    5. *Cumulative Error*

¶ 75          Defendant argues that even if each of the foregoing alleged instances of ineffective assistance of counsel were not prejudicial when considered individually, a reasonable probability exists that the cumulative effect of all these errors would have changed the outcome of trial. "[W]hile individual trial errors may not require a reversal, those same errors considered together may have the cumulative effect of denying defendant a fair trial." *People v. Speight*, 153 Ill. 2d 365, 376 (1992). See also *People v. Vera*, 277 Ill. App. 3d 130, 141 (1995) (holding that, although any one error of counsel may not have satisfied the *Strickland* test, the error cumulatively rendered the result of the proceedings unreliable under the *Strickland* standard).

¶ 76          We hold that, even considered cumulatively, defendant was not prejudiced by the four alleged instances of ineffective assistance of trial counsel. Trial counsel did not perform deficiently in impeaching Michael and Jackie regarding the jail phone calls, as he properly introduced extrinsic evidence of the contents of the calls. We have found that it is not reasonably probable that defendant's confession would have been suppressed if counsel raised the issue again during trial or posttrial proceedings, and we have considered and rejected defendant's argument on appeal that his motion to suppress was improperly denied.

¶ 77          The remaining alleged instances of ineffective assistance of counsel concerned counsel's failure to offer the Western Union security camera footage and to object to the cellular phone records. Even if the Western Union video had been admitted and the cellular phone records had been excluded, a reasonable probability does not exist that the result of the trial would have been different. As we previously discussed, the Western Union video footage was

relatively insignificant evidence and the cellular phone records were cumulative of other evidence presented at the trial.

¶ 78                              III. CONCLUSION

¶ 79          For the reasons stated, we affirm the trial court's judgment.

¶ 80          Affirmed.