NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 210489-U

NO. 4-21-0489

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 5, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| MOISES B. TRUJILLO, | ) | No. 17CF310 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court did not err in denying defendant's motion to suppress his confession based on the totality of the circumstances.

(2) The trial court conducted a sufficient *Krankel* hearing on defendant's claims of ineffective assistance of counsel.

(3) The trial court did not err in making a record of its sentencing determination.

(4) Defendant's sentence was not subject to double enhancement due to the application of a 25-year firearm enhancement.

¶ 2    In April 2021, after a jury trial, defendant, Moises B. Trujillo, was found guilty of first degree murder and armed robbery. The trial court sentenced defendant to an aggregate sentence of 80 years' imprisonment.

¶ 3    On appeal, defendant argues (1) the trial court erred by denying his motion to suppress statements, (2) the court held an insufficient *Krankel* hearing (*People v. Krankel*, 102

Ill. 2d 181, 464 N.E.2d 1045 (1984)), (3) the court failed to make an adequate record of its sentencing determination, and (4) defendant's sentence was subject to double enhancement. We affirm.

¶ 4                                          I. BACKGROUND

¶ 5             On March 17, 2017, the victim, Dezmeion Poole, agreed to provide cannabis for defendant. Poole had previously sold cannabis and Xanax to defendant, who both used and resold the drugs. Antonio Ragsdale and Caston Rosa accompanied defendant to Poole's apartment complex, but defendant entered the residence alone. During an altercation, defendant shot Poole, and Poole later died of his injuries.

¶ 6             On March 21, 2017, defendant was arrested in relation to a failure-to-appear warrant related to Sangamon County case No. 16-CF-666. Detectives suspected defendant was involved in the death of Poole. Therefore, they placed him in an interrogation room before he was booked into jail on the failure-to-appear warrant. Before questioning, detectives gave defendant *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). During the interview, defendant denied shooting Poole but admitted to purchasing drugs from him on March 17. After approximately five hours of questioning, the detectives left the room. While the detectives were gone, defendant placed a chair on the table and used it to climb into the ceiling. Officers pulled defendant out of the ceiling, and he fell to the floor and repeatedly asked the officers to kill him. The detectives terminated the interview and defendant was taken to the hospital.

¶ 7             After being released from the hospital, defendant was booked into the Sangamon County jail. The jail staff placed defendant in a high-risk cell due to his escape attempt and suicidal statements after being pulled from the ceiling.

¶ 8        On March 23, 2017, detectives conducted a second interview with defendant, during which he confessed to shooting Poole. On March 25, defendant requested to speak with detectives and confirmed his confession.

¶ 9        A grand jury indicted defendant for four counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2016)) and one count of armed robbery (720 ILCS 5/18-2(a)(4) (West 2016)). After initially being appointed counsel, defendant elected to proceed *pro se* for a period.

¶ 10                              A. Motion to Suppress

¶ 11        In March 2019, defendant filed a *pro se* motion to suppress his statements to detectives. In his motion, defendant argued his statements were involuntary and detectives coerced his statements under severe emotional duress. Defendant alleged detectives (1) denied him the right to make a reasonable number of phone calls, contact family, and obtain legal representation; (2) kept him in isolation; and (3) implied he would receive more lenient treatment if he confessed. Defendant also claimed he was a "worn-out drug addict with a low IQ and withdrawing from drug abuse after taking Xanax pills all week."

¶ 12        The State filed a written response and argued defendant was allowed to contact his mother and his girlfriend, Chris Kennedy, knew his whereabouts. The State further contended the detectives did not make any promises but merely encouraged defendant to tell the truth. According to the State, there was no evidence defendant was under the influence or withdrawing from any substance, and defendant was kept in a high-risk cell for only two days before his statements.

¶ 13        The trial court held a hearing on the motion, where the video recordings of defendant's March 21, 23, and 25 interviews were admitted. As the hearing was not finished on

the first date, the matter was continued. At the next hearing date, defendant requested the appointment of counsel, which the court allowed.

¶ 14 Defendant's trial counsel filed an amended motion to suppress statements, which fully incorporated defendant's *pro se* motion. The amended motion further alleged defendant was arrested on a failure-to-appear warrant on March 21, but officers did not bring defendant before the court until March 27, in violation of requirements of the warrant and section 109-1 of the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/109-1(a) (West 2016)) to bring defendant before a judge "without unnecessary delay." The motion expanded on defendant's claim he was unable to contact family by arguing he was denied phone access in violation of section 103-3 of the Criminal Procedure Code (*id.* § 103-3). Finally, the motion argued detectives induced defendant's confession with specific promises. In response, the State incorporated its prior response to defendant's *pro se* motion and added an argument defendant was provided *Miranda* warnings.

¶ 15 The trial court held a two-day hearing on the amended motion. Detective Michael Flynn testified defendant was arrested on March 21, 2017, pursuant to a warrant. Officers placed defendant in an interrogation room, removed his handcuffs, allowed him to wash his hands, and provided him with water, food, and cigarettes. According to Flynn, defendant looked "fine," other than small, superficial scratches on his nose and forehead, and did not seem to be intoxicated. Before questioning defendant with Detective Paula Crouch, Flynn provided defendant with *Miranda* warnings. Flynn stated he made no specific promises and encouraged defendant to tell the truth. After approximately five hours, the detectives left the room. Once alone, defendant placed a chair on the table and used it to climb into the ceiling. Immediately, officers entered the room and pulled defendant out of the ceiling, and defendant fell to the floor.

Defendant repeatedly asked officers to kill him. Before being taken to the hospital, defendant was allowed to see Kennedy. After his release from the hospital, defendant was booked into jail.

¶ 16    During the second interview with defendant on March 23, Flynn testified defendant asked to call his mother. Flynn responded, "When you're done talking and if you're honest, I don't have a problem with you calling her." Flynn explained defendant was placed in a high-risk cell due to his statements after being pulled from the ceiling. During this second interview, Flynn testified defendant confessed to killing Poole. After detectives finished speaking with defendant on March 23, he was allowed to call Kennedy, his mother, his brother, and an immigration official. Two days later, on March 25, defendant requested to speak with detectives again, where he confirmed his March 23 confession.. Defendant requested phone access during his third interview. Defendant's phone at the county jail was shut off because Ragsdale had not been located. He was given full phone access on March 27, though Ragsdale had not yet been located. Flynn testified he did not make any promises during the interviews.

¶ 17    During cross-examination, defendant offered into evidence: (1) the original arrest warrant, (2) the probable-cause statement for criminal damage related to defendant climbing into the ceiling, which showed bond set at $100,000, (3) court records in case No. 16-CF-666, which showed defendant was not brought before a judge until March 27, and (4) the probable cause statement for armed robbery entered March 23. The parties also stipulated to the admission of defendant's jail and hospital records.

¶ 18    Detective Crouch testified she assisted Flynn during defendant's interrogations. On cross-examination, Crouch acknowledged by the second interview, she was aware defendant had "some issues with Xanax."

¶ 19 Defendant moved for a directed finding on his motion to suppress his statements, which the trial court denied.

¶ 20 Defendant testified he was 23 years old at the time of the interrogations, he had a ninth-grade education, and Spanish was his first language. He admitted on cross-examination he had no issues speaking English. Defendant testified he had been arrested "a couple of times" and was familiar with the county jail system, but he had never been interrogated or given *Miranda* warnings. When defendant was arrested on prior occasions, his mother or brother would assist him in posting bond, but he testified he was not allowed to call them until after he gave his statement on March 23. On that date, defendant believed Kennedy was in custody because detectives showed him Kennedy's booking photos. According to defendant, he "felt like [he] had no choice but to give the statement in order to communicate with [his] family or to see a judge later."

¶ 21 Defendant acknowledged he abused alcohol, Xanax, cocaine, and cannabis. He described his Xanax use as: "I would pop pill after pill just all day long." Defendant started to feel withdrawal symptoms the day he was arrested. He did not tell jail staff he was withdrawing because he was afraid he would be kept from the phones if they believed he was high risk. On March 25, defendant was taken to the hospital because he had a panic attack and was given Librium to treat his withdrawal symptoms.

¶ 22 The trial court denied defendant's motion to suppress, stating it considered:

"the factors as laid out in the case law, including the Defendant's age, intelligence, background, experience, mental capacity, education, physical condition at the time of the questioning, legality and duration of the detention,

presence of *Miranda* warnings, the duration of the questioning, and any physical or mental abuse by police, including the existence of threats or promises." The court further found "the delay, itself, or the duration of the detention" did not make defendant's statement involuntary. The court noted, as to Xanax withdrawal, defendant was "following along the questions, answering questions appropriately, speaking in complete sentences," and did not appear to be under the influence or withdrawing in the video recordings of the interrogations. As to promises, the court found the detective's statements were open-ended and not promises, except for Flynn's statement on conditional phone use, which the court found did not make defendant's statement involuntary when reviewing the totality of the circumstances. Finally, the court explained the purpose of phone calls is to let family members know where an arrestee is located and enlist help for procedural safeguards, which defendant's interactions with Kennedy satisfied. Reviewing the totality of the circumstances, the court determined defendant's statements were not involuntary.

¶ 23                                B. Trial

¶ 24        Defendant's jury trial commenced in April 2021. During opening statements, the State presented its theory of the case that defendant planned to rob Poole, obtained a firearm, displayed the firearm to rob Poole, and fatally shot Poole in the ensuing scuffle. The defense's theory of the case asserted Poole attacked defendant during the cannabis transaction, causing defendant to use justified force, and defendant's contrary admissions were the result of coercive police tactics. It was not disputed that defendant shot Poole, causing his death.

¶ 25        Poole's body was discovered on March 17, 2017. He was found in his bedroom, which was in disarray, and blood was splattered on the walls and furniture. Loose cannabis and currency were visibly strewn on the floor, and Poole was found with $354 in cash in his pockets.

Two firearms were located in Poole's bedroom—a rifle lying under the bed and a handgun under the mattress. Poole was shot five or six times, with the most significant injury to Poole's stomach. Review of Poole's cell phone records showed calls from defendant's phone number at 2:30 p.m. and 2:51 p.m. on March 17, 2017.

¶ 26 Police arrested defendant at his residence, where he was found hiding in the attic. In defendant's and Kennedy's bedroom, police found $762, a scale, smoking pipes, and 37.3 grams of cannabis. Officers located defendant's cell phone, which revealed Internet searches about Springfield homicides after the shooting.

¶ 27 The State offered as evidence portions of the videos of defendant's three interviews with detectives. In the first interrogation on March 21, defendant denied shooting Poole, but eventually he admitted to purchasing drugs from Poole on March 17, 2017. The first interview ended with defendant's attempted escape into the ceiling. In the second interview, on March 23, defendant told investigators he planned the robbery with Rosa, and defendant was given a firearm. Defendant acknowledged he "upped" the interaction with Poole by displaying his gun, and defendant and Poole got into a fight. During the altercation, defendant discharged the firearm multiple times, striking Poole. Then defendant left with Poole's flip phone, which Poole used exclusively for drug transactions, Poole's wallet, and a jar of cannabis. Defendant returned the firearm, disposed of the wallet and phone, and burned his bloody clothing.

¶ 28 Rosa testified for the State. Rosa acknowledged he was currently facing charges as an accessory to Poole's murder and had other unrelated pending charges. He confirmed no promises were made for his testimony, but he was hoping the State would consider his cooperation. On March 17, 2017, defendant called Rosa looking for a ride. Defendant agreed to supply Rosa with cannabis at a reduced rate in exchange for a ride. Rosa arranged for a ride with

Ragsdale and gave defendant $50. Defendant went inside an apartment alone for 5 to 10 minutes. When defendant returned, he looked like he had been in a fight, was cursing, and had a jar containing cannabis, which he did not possess before entering the apartment. The group returned to defendant's residence, where defendant placed a gun, a wallet, two phones ("a flip phone and maybe an iPhone"), and cannabis on a table. Defendant gave Rosa more cannabis than he had paid for and asked him to leave. A few days later, defendant contacted Rosa and stated they needed to talk. When Rosa spoke to the police, he told them about defendant's plan to rob Poole because he believed that was the story the officers wanted to hear. The State then introduced Rosa's prior inconsistent statements, in which Rosa told detectives defendant intended to rob Poole and Rosa helped him procure a firearm.

¶ 29    Juan Carlos Reyes testified he was a prior acquaintance of defendant. In the evening of March 17, 2017, defendant came to Reyes's house with a bag of cannabis. At that time, defendant appeared skittish and had bruising and scratches. Reyes stated defendant was mumbling that he had been "thinking about some robberies," that he "might have hurt somebody," and that he "f*** up."

¶ 30    At trial, defendant testified in his defense. In 2017, defendant used and sold cannabis and Xanax. At some point, he had traded cannabis for a small firearm, which he used for protection. According to defendant, on March 17, Rosa asked him for cannabis. Once Rosa offered defendant a ride and provided him with $50, he contacted Poole, who often sold him cannabis. Mistakenly, defendant believed he had $400, but he had been using Xanax and did not count the bills. When Poole accused him of not having enough money, a fight ensued and defendant was knocked to the ground and raised his firearm. As Poole turned towards his dresser, where defendant believed Poole kept a firearm, defendant discharged his firearm several

times at Poole. As they fought over the firearm, defendant was able to shoot Poole one more time. After that shot, Poole stopped and sat down. Believing he had paid for the cannabis, defendant took the jar of cannabis and Poole's flip phone, which he was afraid would link him to the altercation, and left. Defendant admitted he "freak[ed] out" and did not "cop[e] real well" after the incident, which led to his escape attempt after his arrest. According to defendant, he told detectives "what they wanted to hear" so he could make phone calls and get out of a high-risk cell.

¶ 31    The jury found defendant guilty of intentional murder, including that defendant personally discharged the firearm causing Poole's death, and armed robbery.

¶ 32                    C. *Krankel* Hearing

¶ 33    While still represented by counsel, defendant filed a *pro se* motion for a new trial, which made several ineffective assistance of counsel claims. Specifically, defendant alleged counsel, William Vig, was ineffective for: (1) failing to request a jury instruction for involuntary manslaughter, (2) proceeding to trial when defendant had filed a complaint with the Attorney Registration and Disciplinary Commission (ARDC) against Vig, (3) refusing to adopt defendant's *pro se* motion to dismiss the indictment, (4) failing to raise the State's failure to prove *corpus delicti* as to defendant's armed robbery offense, (5) failing to instruct the jurors on the one-act, one-crime doctrine, (6) failing to object to certain statements of the prosecutor, and (7) failing to present exculpatory evidence.

¶ 34    At defendant's sentencing hearing, the trial court acknowledged defendant's motion and, pursuant to *Krankel*, gave defendant the opportunity to elaborate or explain his claims of ineffective assistance of counsel. Defendant detailed the following claims of ineffective assistance: Vig failed to (1) object to certain statements made by prosecutors that

- 10 -

mischaracterized evidence, (2) object to the State not calling Ragsdale or other witnesses on the witness list, (3) present evidence indicating defendant already possessed narcotics and would have no motivation to rob Poole, (4) adopt defendant's *pro se* motion to dismiss the indictment, (5) argue Rosa had motivation to lie, (6) offer an involuntary manslaughter instruction, and (7) communicate with defendant in light of the outstanding ARDC complaint. After allowing Vig to respond, the court determined defendant's claims had no factual basis and the claims related to trial strategy.

¶ 35　　　　　Following the *Krankel* hearing, the trial court proceeded to sentencing.

¶ 36　　　　　　　　　　　　　D. Sentencing

¶ 37　　　　　At sentencing, the State alleged numerous aggravating factors, including defendant's conduct caused or threatened serious harm, defendant received compensation for committing the offense, defendant's criminal history, the need for deterrence, and defendant's lack of remorse. The State recommended 50 years for murder, including a 25-year firearm enhancement, and 35 years for armed robbery, including the mandatory 25-year enhancement if the trial court found defendant caused great bodily harm, for an aggregate prison sentence of 85 years.

¶ 38　　　　　Defense counsel maintained serious harm was an element of first degree murder and armed robbery, compensation was a factor inherent in armed robbery, and defendant had no prior felony convictions. Defense counsel also stated, "I would argue, Your Honor, and I will concede I have not found case law that supports my argument, but I believe that is inherent to the idea of due process, that the same gun and the same death should not enhance multiple offenses." Counsel requested an aggregate sentence of no more than 51 years.

¶ 39　　　　　The trial court sentenced defendant as follows:

"Having now considered the trial evidence, the Presentence Investigation Report and exhibits and additions and corrections, the history, character and attitude of the Defendant, the evidence and arguments, statement of allocution presented, considering all the factors in aggravation, the appropriate ones, and mitigation, and with due regard to the circumstances of the offense, I do find as follows and I hereby sentence the Defendant to serve in the aggregate, it'll be eighty years in the Illinois Department of Corrections, and the breakdown of that is Counts I through IV would merge into a sentence of forty-nine years to be served at a hundred percent with the firearm enhancement and three years mandatory supervised release.

That is consecutive to a thirty-one year sentence with a great bodily harm finding and gun enhancement at eighty-five percent, with three years mandatory supervised release, for an aggregate of eighty years in the Illinois Department of Corrections."

¶ 40        Defendant filed a motion to reconsider, arguing, in part, the court erred by (1) applying a 25-year firearm enhancement to both counts and (2) "failing to 'specify on the record the particular evidence, information, factors in mitigation and aggravation or other reasons that led to his sentencing determination' as required by 730 ILCS 5/5-4-1(c) when imposing a sentence for a violent crime." The court disagreed and denied the motion.

¶ 41        This appeal followed.

¶ 42                                II. ANALYSIS

¶ 43        On appeal, defendant argues (1) the trial court erred by denying his motion to suppress statements, (2) the court held an insufficient *Krankel* hearing, (3) the court failed to

make an adequate record of its sentencing determination, and (4) defendant's sentence was subject to double enhancement. We address each argument in turn.

¶ 44                                    A. Motion to Suppress

¶ 45        Defendant contends the trial court erred by denying his motion to suppress his confession because his confession was involuntary. Specifically, defendant maintains, his will was overborne by (1) the limitations on his phone access, (2) the conditions of his confinement, including the length of time before he saw a judge, (3) withdrawing from Xanax, and (4) promises of leniency from detectives.

¶ 46        "Where the defendant challenges the admissibility of an inculpatory statement by filing a motion to suppress, the State bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary." *People v. Salamon*, 2022 IL 125722, ¶ 84, 202 N.E.3d 283. On review, we will reverse the trial court's factual findings only if they are against the manifest weight of the evidence. *Id.* ¶ 75. However, "the ultimate legal determination as to whether suppression is warranted is reviewed *de novo*." *Id.*

¶ 47        "The rule prohibiting the admission of an involuntary confession is rooted in the self-incrimination clause of the fifth amendment [citation] and the due process clause of the fourteenth amendment." *Id.* ¶ 76. "To ascertain the admissibility of a confession under either amendment, courts consider whether the defendant's confession was voluntary and will exclude a confession that is involuntary." *Id.* "[T]he test of voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion of inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500, 670 N.E.2d 606, 613 (1996). "The voluntariness of a confession depends on the

totality of the circumstances of the particular case, and no single factor is dispositive." *Salamon*, 2022 IL 125722, ¶ 81.

> "The relevant factors include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning. [Citation.] In addition, courts consider the legality and duration of the detention, the duration of the questioning, the provision of *Miranda* warnings, and any physical or mental abuse by police, including the existence of threats or promises." *Id.*

¶ 48 Although the voluntariness of a confession depends on the totality of the circumstances, we will first address each of defendant's contentions regarding his motion to suppress individually before reaching an ultimate conclusion based on the totality of the circumstances.

¶ 49 1. *Phone Access*

¶ 50 Defendant first contends his confession was involuntary because the detectives improperly denied him telephone access.

¶ 51 Section 103-3(a) of the Criminal Procedure Code (725 ILCS 5/103-3(a) (West 2016)) states:

> "Persons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a reasonable time after arrival at the first place of custody."

The statute does not provide what a "reasonable time" may entail. The purpose of section 103-3 is to permit an accused "to notify his family of his whereabouts and to notify them of the nature of the offense with which he is charged so that arrangements may be made for bail, representation by counsel, and other procedural safeguards that the defendant cannot accomplish for himself while in custody." *People v. Prim*, 53 Ill. 2d 62, 69-70, 289 N.E.2d 601, 606 (1972). The statute contains no remedy for a violation, and appellate courts have found the statute is not violated if the defendant does not indicate he wants a phone call specifically to enlist legal representation. See, *e.g.*, *People v. Williams*, 2017 IL App (1st) 142733, ¶ 30, 88 N.E.3d 66.

¶ 52 In this case, the trial court determined officers allowed defendant to make contacts with his family consistent with the purpose of the statute, "to let family members know where an arrestee is and enlist their help for procedural safeguards." Defendant was allowed to speak to Kennedy in person on March 21, before he made any confession. Defendant then called Kennedy on March 22 at 12:18 a.m. to inquire about obtaining bail money. Kennedy informed defendant she had contacted his family and informed them of his situation. Defendant had been arrested between 3 p.m. and 4 p.m. on March 21, meaning he had contact with Kennedy "in any other reasonable manner" within hours of his arrest and placed a phone call to her within nine hours of his arrest. In addition, defendant was allowed further calls to his mother, brother, and an immigration officer on March 23. Defendant's family therefore knew his whereabouts, and he was able to enlist their help for procedural safeguards. See *People v. Green*, 2014 IL App (3d) 120522, ¶¶ 53-55, 19 N.E.3d 13. As the record is devoid of any evidence that demonstrates defendant's later requests to call family members were made for assistance in obtaining legal representation, denial of those requests was not a violation of the statute.

¶ 53 2. *Conditions of Confinement*

¶ 54        Defendant argues he was not properly brought before a judge until six days after his arrest, rendering his confession involuntary.

¶ 55        Section 109-1(a) of the Criminal Procedure Code (725 ILCS 5/109-1(a) (West 2016)) provides:

> "A person arrested with or without a warrant shall be taken without unnecessary delay before the nearest and most accessible judge in that county *** and a charge shall be filed. Whenever a person arrested either with or without a warrant is required to be taken before a judge, a charge may be filed against such person by way of a two-way closed circuit television system, except that a hearing to deny bail to the defendant may not be conducted by way of closed circuit television."

Noncompliance with section 109-1(a) "does not, by itself, obviate a confession or render an otherwise voluntary confession inadmissible at trial." *People v. Ballard*, 206 Ill. 2d 151, 176, 794 N.E.2d 788, 805 (2002). Delay in bringing the arrestee before a judge is merely a factor to be considered on the question of voluntariness. *Id.*

¶ 56        Whether there was "unnecessary delay" must be determined on a case-by-case basis. *Id.* at 177. There is no fixed number of hours which constitutes an unnecessary delay; however, "Illinois decisions suggest a delay of 24 to 36 hours prior to presentment is usually not considered to be unnecessary." *Id.* at 177-78.

¶ 57        In this case, defendant was arrested on a warrant between 3 p.m. and 4 p.m. on Tuesday, March 21, 2017. Defendant was brought before a judge on Monday, March 27, 2017, in case No. 16-CF-666. Defendant acknowledges his detention was lawful, as on March 21, the trial court made a probable cause finding on defendant's charges of criminal damage and

attempted escape, though the proceeding was held *ex parte*. Rather, defendant argues the increase in bail from $5000 to $100,000, the length of his confinement without seeing a judge, and his placement in a high-risk cell combined to create an environment where defendant believed "the detectives controlled his immediate fate" and increased the "coercive nature" of the interrogation.

¶ 58    The trial court found the duration of detention did not make defendant's confession involuntary. However, the court did not state the delay was not unreasonable. Rather, the court stated, "the delay, itself, or the duration of detention, I don't find that that makes it involuntary." There is nothing in the record to cause us to question our deference to the court's factual determination, because the court did not determine the delay was reasonable. Therefore, there is no need for us to determine whether there was an actual violation of section 109-1(a). We instead defer to the court's factual finding and consider defendant's length and conditions of his detention as a factor in our analysis of the totality of the circumstances.

¶ 59                          3. *Drug Withdrawal*

¶ 60    Defendant next alleges his confession was involuntary because he was suffering from withdrawal symptoms due to his use of Xanax.

¶ 61    "The fact that an accused is under the influence of drugs, self-administered or otherwise, when he or she makes a confession does not make the confession automatically inadmissible." *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 15, 959 N.E.2d 703. Suppression of a statement based on intoxication is warranted if the evidence "plainly shows that a suspect is so grossly intoxicated that he no longer has the capacity to knowingly waive his rights." *People v. Feagans*, 134 Ill. App. 3d 252, 259, 480 N.E.2d 153, 158 (1985). Evidence of less than gross intoxication goes to the weight to be accorded defendant's statement, not its

admissibility, and the trial court should consider the totality of the circumstances surrounding defendant's confession. *Id.*; *People v. Koesterer*, 44 Ill. App. 3d 468, 478, 358 N.E.2d 295, 303 (1976).

¶ 62    In this case, defendant did not argue he was under the effects of a drug. Rather, he maintains he was suffering from the withdrawal effects of not taking a drug. The trial court determined, after reviewing the video of defendant's interviews, defendant had no problem "following along [with] the questions, answering questions appropriately, [and] speaking in complete sentences."

¶ 63    We see no evidence to override our deference to the trial court's factual determination. Defendant failed to present any evidence of how withdrawing from Xanax affected him. Admittedly, defendant had a panic attack on March 25 and had "some anxiety." Otherwise, defendant gave no indication withdrawal affected his mental state sufficiently to make his confession involuntary. On appeal, defendant points to his attempted escape through the ceiling of the interrogation room on March 21. However, in viewing the video of defendant's escape attempt, defendant is clearly planning his journey into the ceiling tiles, attempting to disguise glances at the ceiling by stretching. A calculated decision, no matter how poor a decision, is not indicative of gross intoxication. Further, on March 22 and 23, mental health observations and reviews of defendant support the court's finding. The evaluator found defendant's "mood and affect [were] appropriate and congruent," "[t]here [were] no observations or reports of mental status concerns," and defendant denied he was or would be withdrawing from any drugs or alcohol. Therefore, even if defendant was experiencing the effects of withdrawal from Xanax, the evidence supports a finding it was not extensively impacting defendant's mental state.

¶ 64                              4. *Promises of Leniency*

¶ 65         Defendant next contends promises made by the detectives induced his confession.

¶ 66         "Confessions induced by promises or suggestions of leniency have been held involuntary." *People v. Veal*, 149 Ill. App. 3d 619, 623, 500 N.E.2d 1014, 1017 (1986). In order to constitute a promise of leniency, an officer's statement " 'must be coupled with a suggestion of a specific benefit that will follow if [the] defendant confesses.' " *People v. Henslick*, 2022 IL App (4th) 200481, ¶ 37 (quoting *People v. Johnson*, 285 Ill. App. 3d 802, 808, 674 N.E.2d 844, 848 (1996)). There is no "promise of leniency" if the benefit the defendant will allegedly receive is left open-ended. *Id.* "Advising a defendant that, judicially or otherwise, telling the truth would be the most beneficial course of action is not a promise of leniency in return for a confession." *Id.* ¶ 38.

¶ 67         "[E]ven where promises or suggestions of leniency have been made, the confession is not necessarily inadmissible." *Veal*, 149 Ill. App. 3d at 623; *People v. Robinson*, 286 Ill. App. 3d 903, 906, 676 N.E.2d 1368, 1370 (1997). Rather, "[t]he ultimate question is whether, considering the totality of the attendant circumstances, defendant's will was overcome at the time he confessed." *Veal*, 149 Ill. App. 3d at 623.

¶ 68         In the instant case, the trial court found the majority of statements made by the detectives were merely encouraging defendant to tell the truth, and the detectives did not offer defendant specific benefits for his confession. Defendant acknowledged, on the first day, the detectives did not make any promises, and he did not testify to any promises given during the other interviews. The detectives testified they did not make any promises. On appeal, defendant points to specific statements from detectives: (1) to have a life with Kennedy, defendant would need to tell the truth and (2) detectives would have no "problem" with defendant calling his

mother if he was honest. The first statement is not a firm promise sufficient to override our deference to the court's factual determination. See *Henslick*, 2022 IL App (4th) 200481, ¶ 38 ("If the benefit that a defendant purportedly will reap from telling the truth is left open-ended instead of being specified, there is no promise of leniency—and hence there is no factor to balance."). As to the second statement, the court specifically noted it may have been a promise; however, it was not sufficient to find defendant's statement was involuntary in a totality-of-the-circumstances analysis. We do not find that the court's determination as to these statements is against the manifest weight of the evidence. As such, we defer to the trial factual determination and consider the final statement in our totality-of-the-circumstances analysis.

¶ 69                              5. *Totality of the Circumstances*

¶ 70            Reviewing the totality of the circumstances surrounding defendant's confession, we do not find defendant's statements to be involuntary.

¶ 71            Defendant was 23 years old at the time of his arrest. He had a ninth-grade education, appeared to understand the questions asked of him, and answered appropriately and in complete sentences. Defendant mentioned Spanish was his first language, but he spoke English fluently and never requested a translator or showed any indication he did not understand. He was provided with food and water, allowed to use the restroom as needed, and given cigarettes. Defendant was in good physical condition, other than the minor injuries sustained from his attempted escape. He did not appear to be under the influence of any drugs and acted reasonably in the circumstances. Defendant also had at least some experience with the criminal justice system.

¶ 72            Defendant's detention of six days before seeing a judge was lengthy but, as defendant acknowledges, legal due to the *ex parte* probable cause hearing. Further, defendant's

- 20 -

first confession occurred just over 48 hours after his arrest. Defendant's placement in a high-risk cell was due to his attempted escape and evidence he may have been suicidal. Defendant was questioned for relatively short durations. His first interview lasted approximately five hours before it was terminated due to defendant's escape attempt. His second interview two days later lasted a little over an hour, including defendant's confession. He was then provided with food and allowed to make phone calls. His final interview, which we note defendant requested, lasted approximately 30 minutes. Detectives provided defendant *Miranda* warnings, and defendant indicated he understood. Only one statement by police could be interpreted as a promise: that detectives would not have "a problem" with defendant calling his mother if he told the truth.

¶ 73 Based on the totality of the circumstances, defendant's will was not overcome at the time of his confession. The length of his detention and one statement by detectives is insufficient to overcome the overwhelming evidence defendant's confession was voluntarily and freely given two days after his arrest. Accordingly, we find the trial court did not err by denying defendant's motion to suppress his confession.

¶ 74 B. *Krankel* Hearing

¶ 75 Defendant next alleges the trial court failed to conduct a sufficient *Krankel* hearing into his *pro se* claim of ineffective assistance of counsel. Although defendant made several ineffective assistance claims before the court, defendant raises only one issue as to the *Krankel* hearing on appeal. Defendant contends the *Krankel* hearing was insufficient because the court failed to ask defendant to explain his claim defense counsel was ineffective for failing to argue the State did not prove the *corpus delicti* of his armed robbery offense.

¶ 76 "The sole question in a *Krankel* inquiry is whether to appoint independent counsel to represent the defendant on his *pro se* ineffective assistance claims." *People v. Rhodes*, 2019 IL

- 21 -

App (4th) 160917, ¶ 12, 128 N.E.3d 1100. "However, the trial court is not required to automatically appoint new counsel when a defendant raises such a claim." *People v. Ayres*, 2017 IL 120071, ¶ 11, 88 N.E.3d 732. Rather, the trial court must " 'conduct an adequate inquiry ***, that is, inquiry sufficient to determine the factual basis of the claim.' " *Id.* (quoting *People v. Banks*, 237 Ill. 2d 154, 213, 934 N.E.2d 435, 468 (2010)). "[A] trial court's method of inquiry at a [preliminary] *Krankel* hearing is somewhat flexible." *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 85, 31 N.E.3d 935. Ordinarily, an adequate inquiry may include "(1) questioning the trial counsel, (2) questioning the defendant, [or] (3) relying on [the court's] own knowledge of the trial counsel's performance in the trial." *People v. Peacock*, 359 Ill. App. 3d 326, 339, 833 N.E.2d 396, 407 (2005). We review the adequacy of the trial court's *Krankel* inquiry *de novo*. *In re T.R.*, 2019 IL App (4th) 190529, ¶ 81, 146 N.E.3d 692.

¶ 77 According to defendant, the trial court's preliminary inquiry was inadequate because it did not inquire into his claim trial counsel was ineffective for failing to raise a *corpus delicti* defense. "The *corpus delicti* of a crime has two components: (1) proof of the occurrence of the harm, and (2) that the harm was caused by criminal conduct." *People v. Marcotte*, 337 Ill. App. 3d 798, 803, 787 N.E.2d 369, 374 (2003). *Corpus delicti* may not be proved by a defendant's confession alone. *People v. Phillips*, 215 Ill. 2d 554, 576, 831 N.E.2d 574, 586 (2005). "The defendant's statement must be corroborated with independent evidence which tends to show that the offense occurred." *Marcotte*, 337 Ill. App. 3d at 803. Importantly, it is not required that this independent evidence be sufficient to prove the existence of the crime beyond a reasonable doubt. *Phillips*, 215 Ill. 2d at 576.

¶ 78 Here, we conclude the trial court's inquiry was adequate under *Krankel*. In his motion for a new trial, defendant asserted counsel "failed to raise the *corpus delicti* rule and that

the State's prosecutor did not prove the *corpus delicti*." Subsequently, at the *Krankel* hearing, the court invited defendant to "go ahead and go through any issues [he] like[d]." Although defendant did not use the term "*corpus delicti*" at the hearing, defendant explained, among his other claims, counsel "failed to raise the issue that the evidence [the State] supported for armed robbery was not sufficient because there was certain messages *** showing that [he] had no intention to commit *** armed robbery," as the messages indicated he "had these drugs before the incident ever happened." Defendant, therefore, had the opportunity to explain his belief trial counsel was ineffective for not challenging the State's proof armed robbery occurred at all.

¶ 79        Further, even if defendant failed to explain the factual basis for his *corpus delicti* claim, he raised it in his written motion. The trial court may rely on its own knowledge of trial counsel's performance when considering if issues raised have a sufficient factual basis. *Peacock*, 359 Ill. App. 3d at 339. At trial, Rosa testified, when defendant returned to the vehicle from Poole's apartment, he had a jar containing marijuana with him that he did not have when he went into the apartment. When they returned to defendant's residence, defendant placed a gun, a wallet, two phones, one of which was a flip phone, and the cannabis on the table. It was therefore reasonable to conclude based on the evidence and defendant's confession that defendant was in possession of property, the cannabis, that did not belong to him and that he obtained during his encounter with Poole. Defendant's belief he paid Poole for the cannabis is irrelevant to the State proving the evidence tended to show a robbery occurred. The court could rely on its own knowledge of this evidence presented at trial to conclude there was no factual basis for defendant's *corpus delicti* claim. As the court could reasonably determine defendant's claim had no factual basis based on its available knowledge, the court conducted a sufficient *Krankel* hearing.

¶ 80                                    C. Sentencing Record

¶ 81          Defendant next argues the trial court erred in denying his motion to reconsider his

sentence because the court did not make a record of the basis for defendant's aggregate 80-year

sentence.

¶ 82          "The trial court is vested with broad authority to craft and impose an appropriate

sentence." *People v. Sims*, 2022 IL App (2d) 200391, ¶ 148. A reviewing court gives substantial

deference to the trial court's sentencing decision because the trial judge, having observed the

defendant and the proceedings, is in a much better position to consider these factors. *People v.*

*Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656. There is a presumption that a trial court

considered all relevant factors in determining a sentence, and that presumption will not be

overcome without explicit evidence in the record that the trial court did not consider mitigating

factors. *People v. Flores*, 404 Ill. App. 3d 155, 158, 935 N.E.2d 1151, 1155 (2010). We will not

reverse the court's sentencing determination absent an abuse of discretion. *Snyder*, 2011 IL

111382, ¶ 36. An abuse of discretion will be found only "where the sentence is greatly at

variance with the spirit and purpose of the law[ ] or manifestly disproportionate to the nature of

the offense." (Internal quotation marks omitted.) *Id.*

¶ 83          Section 5-4-1(c) of the Unified Code of Corrections (Corrections Code) states:

              "In imposing a sentence for a violent crime *** when such offense

              resulted in the personal injury to someone other than the defendant, the trial judge

              shall specify on the record the particular evidence, information, factors in

              mitigation and aggravation or other reasons that led to his sentencing

              determination. The full verbatim record of the sentencing hearing shall be filed

with the clerk of the court and shall be a public record." 730 ILCS 5/5-4-1(c) (West 2016). Our supreme court has held section 5-4-1(c) does not require the trial court to set out its reasons for imposing a particular sentence. See *People v. Davis*, 93 Ill. 2d 155, 162-63, 442 N.E.2d 855, 858 (1982). In *Davis*, the court held that "shall" was permissive rather than mandatory and that the trial court has "no independent duty" to provide reasons for a particular sentence. *Id.*

¶ 84 Defendant acknowledges the supreme court's holding in *Davis*. He argues that, unlike the defendant in *Davis*, defendant here demanded the court abide by section 5-4-1(c) in his motion to reconsider. Defendant does not cite any authority expressing his request for more specificity requires the trial court to explain its reasoning for defendant's sentence. Accordingly, "we adhere to the 'well-established precedent' that a trial court is neither required to specify on the record the reasons for the sentence imposed, nor recite and assign value to each factor presented at the sentencing hearing." *People v. Brown*, 2018 IL App (1st) 160924, ¶ 18, 129 N.E.3d 150 (quoting *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 95, 90 N.E.3d 1117).

¶ 85 Further, even if a trial court were required to provide its reasoning for a particular sentence at the defendant's request, the trial court here has provided the level of specificity required. In sentencing defendant, the court explained:

> "Having now considered the trial evidence, the Presentence Investigation Report and exhibits and additions and corrections, the history, character and attitude of the Defendant, the evidence and arguments, statement of allocution presented, considering all the factors in aggravation, the appropriate ones, and mitigation, and with due regard to the circumstances of the offense, I do find as follows ***."

Although the court's explanation was not to the level of specificity defendant would like, the court did explain the evidence it considered in fashioning defendant's sentence. See *People v. Carron*, 298 Ill. App. 3d 676, 679, 699 N.E.2d 241, 244 (1998).

¶ 86          We note we encourage the trial courts to give defendants an explanation of their sentencing decision. See *Davis*, 93 Ill. 2d at 163-68 (Simon, J., dissenting); *People v. Jackson*, 375 Ill. App. 3d 796, 804-10, 874 N.E.2d 592, 598-603 (2007) (McDade, J., specially concurring, and Wright, J., concurring in part and dissenting in part); *People v. Bryant*, 2016 IL App (1st) 140421, ¶¶ 25-35, 55 N.E.3d 97 (Hyman, J., specially concurring). However, a lack of an expansive explanation does not render a sentencing determination inadequate. As the trial court stated it considered the proper evidence before it, we do not find the court erred in its pronouncement of defendant's sentence or in denying defendant's motion for reconsideration.

¶ 87                            D. Double Enhancement

¶ 88          Finally, defendant maintains the trial court erred by imposing a 25-year firearm enhancement to his sentence for first degree murder. Specifically, defendant argues that because the use of a firearm is a factor inherent in defendant's conviction for armed robbery, the resulting sentence constitutes an impermissible double enhancement.

¶ 89          As discussed, a trial court has broad discretion in crafting a sentence. *Sims*, 2022 IL App (2d) 200391, ¶ 148. A court abuses that discretion when it considers an improper factor in aggravation. *People v. McAfee*, 332 Ill. App. 3d 1091, 1096, 774 N.E.2d 469, 473 (2002). A court, in general, may not use an element of the offense for which the defendant was convicted as an aggravating factor at sentencing. *People v. Phelps*, 211 Ill. 2d 1, 11-12, 809 N.E.2d 1214, 1220 (2004). In other words, a single factor cannot be used both as an element of an offense and as a basis for imposing "a harsher sentence than might otherwise have been imposed." (Internal

quotation marks omitted.) *Id.* This prohibition against "double enhancements" is based on the assumption the legislature considered that aggravating factor in determining the appropriate penalty range for that offense. *People v. White*, 114 Ill. 2d 61, 65-66, 499 N.E.2d 467, 469 (1986). However, "where the legislature clearly intends to enhance the penalty based upon some aspect of the crime, and such an intention is clearly expressed, there is no prohibition." *Phelps*, 211 Ill. 2d at 15. Whether the trial court considered an improper double enhancement when sentencing a defendant is a question of law, which we review *de novo*. *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 14, 39 N.E.3d 44.

¶ 90        In this case, defendant was convicted of first degree murder and armed robbery. First degree murder carries a penalty of 20 to 60 years in prison. 730 ILCS 5/5-4.5-20(a) (West 2016). Because the jury found defendant personally discharged a firearm that proximately caused the death of Poole, the Corrections Code mandated a 25-year-to-life firearm enhancement. *Id.* § 5-8-1(a)(1)(d)(iii). Defendant was sentenced to 49 years for first degree murder, including a 25-year firearm enhancement. Armed robbery, a Class X felony, carries a 6- to 30-year sentence, and defendant was subject to a mandatory 25-year-to-life sentencing enhancement because the court made a finding of great bodily harm. *Id.* § 5-4.5-25(a); 720 ILCS 5/18-2(b) (West 2016). Additionally, defendant's convictions required consecutive sentencing. 730 ILCS 5/5-8-4(d)(1) (West 2016).

¶ 91        Armed robbery is not a lesser included offense of first degree murder, and defendant was convicted of two distinct offenses based on two distinct acts—the act of robbing Poole and the act of Poole's murder. Our supreme court has held, "even when subject to consecutive sentencing, '[e]ach conviction results in a *discrete sentence* that must be treated *individually*.' " (Emphases in original.) *Phelps*, 211 Ill. 2d at 14 (quoting *People v. Carney*, 196

Ill. 2d 518, 530, 752 N.E.2d 1137, 1144 (2001)). Applying these principles, no enhancement was used twice to improperly elevate a single sentence. Rather, defendant's discrete sentences were statutorily enhanced as the legislature intended. Indeed, at oral arguments, defense counsel conceded the legislature's authority to impose both enhancements where it clearly elects to do so and acknowledged there is no case law limiting this power for aggregate sentences. The trial court did not err in sentencing defendant as the statute required.

¶ 92                                III. CONCLUSION

¶ 93            For the reasons stated, we affirm the trial court's judgment.

¶ 94            Affirmed.